FARGO WOMEN'S HEALTH ORGANIZATION, INC., George Miks, M.D., Susan Wicklund, M.D., Jane Bovard, Administrator; and on behalf of the Staff of Fargo Women's Health Organization, Inc., and Jane Doe(s), being fictitious names intended to designate present and prospective patients of the Fargo Women's Health Organization, Plaintiffs and Appellees,

v.

LAMBS OF CHRIST; Focus on Fargo; Help and Caring Ministries; Community Praise Center; Darold Larson; Jody Clemens; Tim Lindgren; Kathy Beneda Lindgren; Chet Gallagher; Chris Venkelese; Ron Maxon; Operation Rescue; and all other individuals, associations,

and organizations whose names or legal identities are otherwise unknown to Plaintiffs at this time, with whom they have conspired and acted in concert with to deprive Plaintiffs of their rights, Defendants and Appellants.

Civ. No. 920005.

Supreme Court of North Dakota.

Aug. 19, 1992.

William Kirschner, Fargo, for plaintiffs and appellees.

Richard D. Varriano, Moorhead, Minn., for defendants and appellants.

Peter B. Crary, Fargo, for defendants and appellants; appearance only.

VANDE WALLE, Justice.

In this appeal from an order granting a preliminary injunction, we must decide whether the district court properly balanced the rights of anti-abortion protestors to assemble and speak, on the one hand, against the rights of a clinic, its doctors, and its patients to be free from trespass, assault, and other tortious acts done by the protestors in advancing their message, on the other hand. We affirm in part, reverse in part, and remand.

This action began when the Fargo Women's Health Organization, Inc., its doctors, and volunteers (collectively, "the clinic") sought injunctive relief, on their own behalf and on behalf of their present and future patients, against several unincorporated associations and named individuals (collectively, "the protestors") who were alleged to have committed criminal and tortious acts against those seeking the injunction. The plaintiffs submitted, with their complaints, a motion for temporary restraining order and preliminary injunction supported with affidavits from the clinic administrator, a doctor, the coordinator of volunteers, and a volunteer who had also been hired to provide security for the clinic and its employees. The defendants answered the complaint, denying many of the specific allegations of misconduct contained in the complaint. The defendants did not, however, offer any affidavits in support of their denial of specific allegations of misconduct and in opposition to the motion for temporary restraining order and preliminary injunction. The district court issued a temporary restraining order, superseded by the preliminary injunction from which the defendants now appeal. Because this matter has not yet been submitted to a full evidentiary hearing, with testimony and cross examination of witnesses, the record of the events is contained solely in the affidavits submitted on behalf of the plaintiffs in support of their application for a preliminary injunction. No opposing affidavits were submitted. Thus the circumstances we relate and the factual basis for the injunction are taken exclusively from those affidavits.

Since 1981, the Fargo Women's Health Organization has operated a clinic which provides a full range of gynecological medical services including first trimester abortions. Approximately 75 demonstrations by anti-abortion protestors have been held in the vicinity of the clinic. It appears that most of these demonstrations were peaceful, consisting of picketing, leafleting, and speaking to people in the area near the clinic. Beginning March 29, 1991, the character of the protests changed. On that day, 26 people stormed the clinic, broke down a door, occupied its rooms, and locked themselves together using bicycle locks. The demonstrators refused to leave, were

arrested, and were removed by Fargo police after their locks were removed by a locksmith.

On nine other occasions in the ensuing seven months, demonstrators were arrested for criminal acts committed in conjunction with anti-abortion protests. As a result of these actions, patients were confronted and jostled as they attempted to walk to the clinic. Some patients were able to reach the clinic only with the assistance of volunteer "escorts" or professional security officers who walked them through groups of hostile, screaming protestors that surrounded them, stood in their way, forced leaflets into patients' hands and otherwise impeded patients' access to the clinic. Protestors struck, pushed, and threatened escorts and guards with physical harm. One protestor was arrested trying to climb the clinic's fence in order to reach a patient using the clinic's rear entrance.

Patients who attempted to drive to the clinic were confronted at the entrance to the clinic parking lot. Protestors stood in the way of the cars, climbed onto the vehicles' hoods or under the cars. Some protestors attempted to fasten themselves to the frames of cars in order to delay their removal from the site. On one occasion, protestors placed blocks against the tires and attempted to cut a cable in order to disable a car after they succeeded in stopping it in the clinic's driveway. On another occasion, protestors waited across the street from the clinic for a car to approach the parking lot at which point they rushed into the street, stopped the car, and blocked the public road. As a result of these tactics, the clinic was effectively blockaded; patients and staff could not enter or leave the clinic for hours at a time.

The protestors called these blockades "rescues." At anti-abortion rallies held after the "rescues" began, spokesmen for the associations asked volunteers to participate by being jailed for rescuing babies. The rescues were to be part of a two-year campaign to force the clinic to close.

Away from the clinic, protestors followed clinic staff members in cars, and into grocery stores, airports, and other public buildings. Their activities were particularly intense against one of the clinic's doctors. During a five month period, groups as large as 30 demonstrated at the gate of her home, congregating in pre-dawn hours, shouting and honking car horns, and attempting to block the departure of the doctor and her family members. Some protestors roamed on the doctor's property, leaving a banner draped over a car, a baby stroller and basket on her porch. During times when the protestors were near the site, the doctor's house and garage were vandalized. Protestors followed the doctor in cars as she drove to Fargo or to the airport. Groups waited for the doctor in airport parking ramps and rushed at her, yelling and flashing cameras. They leafleted cars at the school of the doctor's daughter, and two protestors were asked to leave the school building when they attempted to obtain a photo of her daughter. A car full of protestors also followed the daughter of one of the clinic's volunteers.

Relying on this record, the district court granted a preliminary injunction. The protestors challenge on appeal the need for an injunction and, in the alternative, argue that several specific provisions are unduly restrictive of their constitutional rights to free speech and assembly.

## I.  APPEALABILITY

This is an appeal from a preliminary injunction. Neither party has raised the issue of appealability but we may consider that issue upon our own motion. *Ceartin v. Ochs,* 479 N.W.2d 863 (N.D. 1992). Section 28–27–02(3), NDCC, provides, in part, that "[a]n order which grants, refuses, continues, or modifies a provisional remedy, or grants, refuses, modifies, or dissolves an injunction ..." may be "carried" to the Supreme Court. In the past, consistent with the doctrine of finality and "our expanding appealability jurisprudence," *Ceartin,* 479 N.W.2d at 865, we have required compliance with the provisions of Rule 54(b), NDRCivP, at least when the injunctive features of the order were incidental and "serve[d] no active purpose," *e.g., Regstad v. Steffes,* 433 N.W.2d

202, 204 (N.D.1988). The absence of a Rule 54(b) certification has not, however, kept us from reviewing "interim relief [which] affects fundamental interests of the litigants." *See Vorachek v. Citizens State Bank of Lankin,* 461 N.W.2d 580, 584 (N.D.1990).

In this case, the preliminary injunction attempts to balance the rights of a clinic, its doctors and staff, and its patients, to the delivery and receipt of medical care against the protestors' fundamental constitutional rights of speech and assembly. The injunctive features of this order serve an active rather than incidental purpose. We therefore conclude that review of this interim order is proper.

## II.  PROPRIETY OF INJUNCTION

■  A court may enjoin conduct which, unrestrained, would produce injury to the plaintiff "when it shall appear by the complaint that the plaintiff is entitled to the relief demanded...."  NDCC § 32–06–02(1). The factors appropriate to determining whether injunctive relief should be granted are: (1) substantial probability of succeeding on the merits; (2) irreparable injury; (3) harm to other interested parties; (4) effect on the public interest. *F–M Asphalt, Inc. v. North Dakota State Hwy. Dept.,* 384 N.W.2d 663 (N.D.1986). "The decision to grant or deny a preliminary injunction is within the discretion of the trial court, and its determination will not be disturbed on appeal unless it appears that the court clearly abused its discretion." *Schauer v. Jamestown College,* 323 N.W.2d 114, 115 (N.D.1982).

The protestors argue, without citing any authority, that the preliminary injunction is improper because it constitutes the substitution of a civil remedy for the criminal process. In particular, they argue that North Dakota criminal law provides an adequate remedy at law and that the purpose of the injunction is to impermissibly substitute a single judge for the protections provided defendants by the criminal justice system. In the past, this court has recognized the principal that "equity has no jurisdiction to restrain the commission of crimes, and that injunction may not issue for the prevention of criminal acts unconnected with violation of legal rights." *Richmond v. Miller,* 70 N.D. 157, 158–59, 292 N.W. 633, 634 (1940); *see also* NDCC § 32–05–02. But, when the acts sought to be enjoined interfere with legal rights, the court's power to issue an injunction is not destroyed because the acts are punishable as a crime. "In such a case, the equitable powers of the court are not put forth to enjoin the commission of a crime, although that may incidentally result; they are put forth to protect legal rights against invasion by acts which, if committed, would cause injury for which the ordinary remedies at law would not afford adequate relief." *Richmond v. Miller,* 70 N.D. at 159, 292 N.W. at 635. *See also Missouri–Kansas–Texas R. Co. v. Neuhoff Bros., Packers,* 297 S.W.2d 316 (Tex.Civ.App.1956) [injunction proper to protect landowner from repeated violations of penal law which interfered with owner's use of property]; 42 Am.Jur.2d, *Injunctions* § 40 (1969).

■  The affidavits offered by the clinic described repeated instances where the protestors invaded the clinic, approached patients or clinic employees in a physically threatening manner, actually struck or restrained patients or employees, blockaded the clinic, and conducted demonstrations so noisy that clinic business was disrupted. The affidavits reported that these activities continued despite the arrests on several occasions of many protestors. The protestors did not challenge this evidence. Relying on this record, the district court found that the clinic made a prima facie showing on its claims of intentional infliction of emotional distress, private and public nuisance and interference with contract, and, as a result, it had shown probable success on the merits justifying the imposition of the preliminary injunction. We conclude that the district court did not abuse its discretion in granting the preliminary injunction.

## III.  TERMS OF INJUNCTION

The protestors challenge several of the injunction's prohibitions as being over-

broad, thus, restricting protected speech, or as being unconstitutionally vague.[1] The overarching theme of the protestors' arguments is that these restrictions upon their expressive activities are not drawn sufficiently narrowly to meet constitutional analysis.

■ Streets, parks and sidewalks are "quintessential" public forums. *International Society for Krishna Consciousness, Inc. v. Lee,* — U.S. —, 112 S.Ct. 2709, 120 L.Ed.2d 669 (1992). While the peaceful exercise of our first amendment rights to speech and assembly are protected from government interference, *United States v. Grace,* 461 U.S. 171, 103 S.Ct. 1702, 75 L.Ed.2d 736 (1983), "the First Amendment does not guarantee the right to communicate one's views at all times and places or in any manner that may be desired." *Heffron v. International Soc'y for Krishna Consciousness, Inc.,* 452 U.S. 640, 647, 101 S.Ct. 2559, 2563–64, 69 L.Ed.2d 298 (1981). Even in a public forum, a state may impose reasonable time, place and manner restrictions upon all expression, whether written, oral or symbolized by conduct. *Clark v. Community for Creative Non–Violence,* 468 U.S. 288, 104 S.Ct. 3065, 82 L.Ed.2d 221 (1984). Time, place and manner restrictions are valid if they "are content-neutral, are narrowly tailored to serve a significant government interest, and leave open ample alternative channels of communication." *Perry Educ. Ass'n v. Perry Local Educator's Ass'n,* 460 U.S. 37, 45, 103 S.Ct. 948, 955, 74 L.Ed.2d 794 (1983). *See also City of Jamestown v. Beneda,* 477 N.W.2d 830 (N.D.1991).

## A. Place Restriction

The protestors challenge the "bubble-zone" restriction contained in subparagraph (d) which prohibits more than two demonstrators from being within 100 feet of the clinic property lines during clinic hours. They argue that the restriction is content-based; the clinic counters that the provision is content-neutral.

■ Governmental regulation of expressive activity is content-neutral so long as it is *"justified* without reference to the content of the regulated speech." *Clark,* 468 U.S. at 293, 104 S.Ct. at 3069 (emphasis added). "A regulation that serves purposes unrelated to the content of expression is deemed neutral, even if it has an incidental effect on some speakers or messages but not others." *Ward v. Rock Against Racism,* 491 U.S. 781, 791, 109 S.Ct. 2746, 2753–54, 105 L.Ed.2d 661 (1989).

■ The justification offered by the clinic in its application for the injunction was the need to be protected from multiple tortious invasions of its rights and the rights of its employees and patients. The clinic supported this application with evidence of protestors entering the clinic, blocking doorways, blocking driveways, swarming pedestrians attempting to reach the clinic, and using force against those attempting to escort these pedestrians, among other things. The clinic also submitted evidence that the protestors intended a two-year campaign to close the clinic. The district court found that the clinic proved a prima facie case on its claims of intentional infliction of emotional distress, private and public nuisance and interference with contract.

---

**1.** The restrictions challenged by the protesters are found in the following paragraphs:

"(b). harassing, intimidating or physically abusing persons entering, leaving or working at FWHO facilities, and the spouses and family members of those persons entering, leaving or working at FWHO;

(c). obstructing the work of the persons located at FWHO facilities by any means—including singing, chanting, yelling, shouting, or screaming—that substantially interferes with the provision of medical services including counseling, with such facility;

(d). going within 100 feet of the property line of FWHO during such times as they are open for business, Monday through Saturday, from 7:30 a.m. til 6:00 p.m., except that two people may quietly and peacefully picket such facility, so long as said people do not interfere with the operations of said facility, or individuals seeking to enter or leave FWHO as provided herein.

(e). following, harassing, photographing, video-taping, and intimidating, or speaking to staff and patients of FWHO who indicate that they do not wish to be spoken to.

(f). distributing leaflets or brochures to any person who has indicated orally or by gesture that such person does not wish to receive such literature."

The protestors have not challenged these findings; they, for purposes of this appeal, therefore concede that the findings provide the justification for the injunction. *See Fargo Women's Health Organization Inc. v. Larson,* 381 N.W.2d 176 (N.D.1986) [in review of preliminary injunction, reviewing court bound by facts presented to district court].

The protestors' attack on the "bubble-zone" restriction rests on their argument that the purpose of the injunction is to silence their expression of pro-life views. In support, they cite a federal circuit court decision, *Mississippi Women's Medical Clinic v. McMillan,* 866 F.2d 788 (5th Cir. 1989), for the proposition that enjoining anti-abortion demonstrations near a clinic impermissibly restricts speech. In doing so, the protestors distort the facts and the import of *McMillan.* In that case, the reviewing court specifically noted that the clinic offered no evidence that the protestors physically restrained potential patients from entering the clinic. The clinic contended that "the protestors had no right to create the tense and agitated atmosphere that surrounded the clinic." 866 F.2d at 791 [emphasis deleted]. The protestors created this atmosphere by distributing literature, and making noise which could be heard within the clinic. In *McMillan,* the conflict was between the right to have an abortion identified in *Roe v. Wade,* 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973), and the right to express, "peaceably, if loudly," the opinion that more is involved in abortion than the mother's choice. 866 F.2d at 791–92.

The *McMillan* court distinguished its case from that presented in *Northern Virginia Women's Medical Center v. Balch,* 617 F.2d 1045 (4th Cir.1980), where the protestors "embarked upon a series of actions involving entering upon the clinic's premises, blocking doors to procedure rooms and blocking access to the [clinic]" in order to prevent the performing of abortions. 617 F.2d at 1048. In *Balch,* the record of trespasses provided a factual basis for a valid injunction. The *McMillan* decision, therefore, stands for the proposition that an attempt to enjoin *peaceful* pro-

life demonstrations outside an abortion clinic is an attempt to enjoin the expression of specific ideas. It must be read in conjunction with *Balch* where an injunction aimed at the use of force, intimidation and violence in expressing opposition to abortion was upheld. When an injunction is based on a record of force, trespass and intimidation, the justification for the injunction is the method of communicating, not the motivating idea. The injunction is, therefore, content-neutral. *See Northeast Women's Center, Inc. v. McMonagle,* 939 F.2d 57 (3rd Cir.1991); *Bering v. Share,* 106 Wash.2d 212, 721 P.2d 918 (1986); *Planned Parenthood Ass'n. v. Project Jericho,* 52 Ohio St.3d 56, 556 N.E.2d 157 (1990); *Planned Parenthood League v. Operation Rescue,* 406 Mass. 701, 550 N.E.2d 1361 (1990).

The record supporting this injunction contains adequate evidence to support the court's finding that the clinic would probably prevail on its claims of intentional infliction of emotional distress, private and public nuisance and interference with contract. We conclude that the justification for the injunction was not made in reference to the content of the protestors' expressive activities; the injunction is content-neutral.

In addition to being content-neutral, a proper time, place or manner regulation must be narrowly tailored to serve a significant government interest and leave open alternative channels of communication. *Perry Educ'n Ass'n., supra.*

The interests served by the injunction are consonant with the justification for its issuance: that trade and commerce be conducted unimpeded by breaches of the peace and that the safety of those engaged in or patronizing a lawful business, in this instance a medical clinic which performs legal abortions, be assured. In particular, the injunction is meant to prevent the protestors from occupying the clinic, blocking its doors, and blockading the driveway, roads and side walks used by vehicles and pedestrians to go to and leave from the clinic. The government's interest in pro-

tecting the clinic's legal rights by preventing or controlling the protestors' tortious conduct meets the "significant government interest" test. *See, e.g., Bering v. Share, supra; Planned Parenthood Ass'n v. Project Jericho, supra; Planned Parenthood League v. Operation Rescue, supra; O.B.G.Y.N. Assoc. v. Birthright of Brooklyn,* 64 A.D.2d 894, 407 N.Y.S.2d 903 (1978); *Portland Feminist Women's Health Ctr. v. Advocates for Life, Inc.,* 859 F.2d 681 (9th Cir.1988); *National Organization For Women v. Operation Rescue,* 726 F.Supp 1483 (E.D.Va.1989) *aff'd.* 914 F.2d 582 (4th Cir.1990) (per curiam).

■ The difficulty in this case is in assessing whether the injunctive provisions are narrowly tailored to protect the interest and whether alternative avenues exist for the protestors' message. The injunction limits, during the clinic's business hours, peaceful picketers to two in the area in front of the clinic; all other protestors are prohibited from coming closer than 100 feet from the clinic's property line. Given the protestors' actions as described in the affidavits, a place restriction may be an appropriate method of regulating the protestors' conduct. This record, however, contains no description of the physical layout of the clinic in relation to its property line, the property line in relation to public sidewalks and roads, or the features of the neighborhood. It gives us no way to judge the "fit" of this place restriction to the circumstances of this case. The court attempted to tailor a place restriction without taking any measurements. Similarly, we are not given any basis for judging the alternative methods of communication available to the protestors. Subparagraph (d) is not sufficiently narrow to satisfy constitutional requirements. We will therefore strike this provision and remand to the trial court for further fact finding on this issue, permitting the trial court to revise this portion of the injunction as to the dimensions necessary for a zone of protection in accord with the evidence to be adduced.

## B. Noise Restriction

■ The protestors challenge the noise restriction contained in subparagraph (c) as being vague. A statute, or injunction, will be considered unconstitutionally vague if it "either forbids or requires the doing of an act in terms so vague that [persons] of common intelligence must necessarily guess at its meaning and differ as to its application." *Connally v. General Constr. Co.,* 269 U.S. 385, 391, 46 S.Ct. 126, 127, 70 L.Ed. 322 (1926). The purpose of the vagueness doctrine is to ensure that all "be informed as to what the state commands or forbids." *Lanzetta v. New Jersey,* 306 U.S. 451, 453, 59 S.Ct. 618, 619, 83 L.Ed. 888 (1939). When so informed, people have an opportunity to conform their conduct to the law, and those who enforce the law are provided with strict guidelines for their application. *Grayned v. City of Rockford,* 408 U.S. 104, 92 S.Ct. 2294, 33 L.Ed.2d 222 (1972). The prohibition against overly vague laws protects people from having to voluntarily curtail First Amendment activities because of a fear those activities could be characterized as illegal activities due to an unconstitutionally vague statute. *Id.*

■ The protestors argue that no definition understandable to a common citizen is given for the prohibited "obstructing the work" of the clinic. "There is little doubt that imagination can conjure up hypothetical cases in which the meaning of these [challenged] terms will be in nice question. The applicable standard, however, is not one of wholly consistent academic definition of abstract terms. It is, rather, the practical criterion of fair notice to those to whom the statute is directed. The particular context is all important." *American Comm. Ass'n v. Douds,* 339 U.S. 382, 412, 70 S.Ct. 674, 691, 94 L.Ed. 925 (1950). The most important context for defining "obstructing" is the rest of the sentence in which the term appears, making it clear that the prohibited act is the making of noise "that substantially interferes with the provision of medical services." In the context of this injunction, supported by evidence that the protestors' demonstrations

were so loud that the noise penetrated the operating rooms, the recovery rooms, and places where staff and patients were discussing medical procedures, and based upon the district court's finding that the clinic had proved a prima facie case of nuisance, this provision can only be construed to proscribe excessive noise.

■■■ The United States Supreme Court reviewed and approved a remarkably similar prohibition challenged on vagueness grounds in *Grayned, supra.* There, an anti-noise ordinance provided that:

> "[N]o person, while on public or private grounds adjacent to any building in which a school or any class thereof is in session, shall willfully make or assist in the making of any noise or diversion which disturbs or tends to disturb the peace or good order of such school session or class thereof...." 408 U.S. at 107–08, 92 S.Ct. at 2298.

The Court concluded that this statute was a statute written specifically for the context, "where the prohibited disturbances are easily measured by their impact on the normal activities of the school. Given this 'particular context,' the ordinance gives 'fair notice to those to whom [it] is directed.'" *Id.* at 112, 92 S.Ct. at 2301. The vagueness of the prohibited "noises" or "diversions" was dispelled by requirements that "(1) the 'noise or diversion' be actually incompatible with normal school activity; (2) there be a demonstrated causality between the disruption that occurs and the 'noise or diversion'; and (3) the acts be 'willfully' done." *Id.* at 113–14, 92 S.Ct. at 2302. These features made the ordinance sufficiently clear to pass constitutional requirements.

The noise injunction challenged by the protestors is substantially the same as the *Grayned* ordinance. The prohibited noise is measured by its impact on the clinic activities, and it must be incompatible with the provision of medical services.[2] There must be causality between the interference

and the noise. And, because the restriction is part of an injunction, the act must be willfully done in order to support sanctions. *Anchor Estate, Inc. v. State,* 466 N.W.2d 111 (N.D.1991). Subparagraph (c) is not unconstitutionally vague. *See also Portland Feminist Women's Health Ctr. v. Advocates for Life, Inc., supra* [noise injunction not vague]; *Planned Parenthood League v. Operation Rescue, supra,* [obstructing-access injunction not vague].

## C. Harassment Restriction

■■■ The protestors also attack as vague subparagraph (b) which enjoins them from "harassing, intimidating or physically abusing" persons connected with the clinic. Again, we must consider this proscription in the context of this litigation, that is, the protestors' past conduct, the relief sought by the clinic, and the district court's findings. *See Northeast Women's Center, Inc. v. McMonagle, supra.*

The protestors blocked patients walking to the clinic and the cars of patients, trapping patients as the protestors screamed, waved signs and flashed cameras in the patients' faces, and forced leaflets on them. The protestors followed the doctor and clinic staffers and members of their families. The protestors waited in airport parking ramps to confront the doctor. The doctor and staffers described the fear and loss of sleep created by these activities and the extraordinary steps taken to assure their safety and that of their families. The district court found that the clinic had stated a prima facie claim of intentional infliction of emotional distress. That finding necessarily includes the finding that the protestors' intentional conduct was extreme and caused severe emotional distress, or was so outrageous that a severe emotional reaction is implied. *See Muchow v. Lindblad,* 435 N.W.2d 918 (N.D.1989). Given this background, the protestors cannot reasonably argue that the prohibition on "harassing, intimidating or physically abus[ive]"

---

**2.** One objective guide of what noise level is incompatible with the provision of medical services is the Fargo ordinance which limits noise levels to 55 decibels in residential zones and 65 decibels in commercial during the hours relevant to the injunction subparagraph (c). Fargo Mun.Ord. § 11–0204.

conduct can be mistaken as describing their lawful expressive activities. Subparagraph (b) is not unconstitutionally vague.

■■■ Subparagraphs (e) and (f) are attacked by the protestors as overbroad. These paragraphs are apparently directed at the protestors' excessive conduct. In addition to "harassing" and "intimidating," subparagraph (e) prohibits "following," "photographing, videotaping," and "speaking" to staff and patients. We construe the trial court's order to enjoin following, photographing, and videotaping done without consent, and persistently and with the intent to harass and intimidate. To the extent that this construction is not clearly set forth in the order, we direct that on remand the trial court modify the order in accordance with our construction. In the context of this case, the order thus construed is permissible. *See Chico Feminist Women's H. Ctr. v. Scully*, 208 Cal.App.3d 230, 256 Cal.Rptr. 194 (3rd Dist.1989). However, "speaking" to staff and patients cannot be constitutionally enjoined. *Cf. City of Bismarck v. Schoppert*, 469 N.W.2d 808 (N.D.1981). We therefore strike that part of the injunction that prohibits "speaking."

■■■ Subparagraph (f) prohibits distributing literature to any person who has indicated a desire not to receive the material. Obviously, distributing literature is protected communicative activity and a complete ban violates the First Amendment. *See, e.g., Lee v. International Society for Krishna Consciousness,* —— U.S. ——, 112 S.Ct. 2709, 120 L.Ed.2d 669 (1992) (per curiam) [explained by *International Society For Krishna Consciousness, Inc. v. Lee,* —— U.S. ——, 112 S.Ct. 2711, 120 L.Ed.2d 541 (1992)]. The prohibition on "physically abusing" persons entering or leaving the clinic contained in subparagraph (b) offers sufficient protection from those protestors who physically force literature on passers-by.

The order of the district court is affirmed in part, reversed in part, and remanded for further proceedings consistent with this opinion.

ERICKSTAD, C.J., and LEVINE, MESCHKE and JOHNSON, JJ., concur.