263 N.J. Super. 200 (1993)
622 A.2d 891
HORIZON HEALTH CENTER, PLAINTIFF-RESPONDENT,
v.
ANTHONY J. FELICISSIMO, HELPERS OF GOD'S PRECIOUS INFANTS, JOHN DOE PICKETERS, AND JANE DOE PICKETERS, DEFENDANTS-APPELLANTS.
Superior Court of New Jersey, Appellate Division.
Argued February 18, 1993.
Decided March 24, 1993.
*203 Before Judges KING, BRODY and LANDAU.
Richard J. Traynor argued the cause for appellants (Michael Patrick Carroll, of counsel and on the brief).
*204 Cynthia V. Fitzgerald argued the cause for respondent (Chasan, Leyner, Tarrant & Lamparello, attorneys; Ms. Fitzgerald, on the brief).
The opinion of the court was delivered by KING, P.J.A.D.
This appeal arises from the grant of a permanent injunction which restrained to an extent the manner and place in which anti-abortion demonstrators could protest on the public ways outside of an abortion clinic and health care center in Jersey City. We uphold the injunction in substantial part but modify its language to avoid an interpretation authorizing a restraint upon the content of the demonstrators' expression.
On October 19, 1991 plaintiff filed a verified complaint and an order to show cause in the Chancery Division seeking to restrain defendants from demonstrating "within 30 feet" of their clinic property on Bergen Avenue in Jersey City. After an ex parte hearing on that date, Judge Schaeffer issued a temporary restraining order. A plenary hearing on the restraint commenced on October 25 and concluded on October 29. On November 4 the judge issued a written opinion and order making the temporary restraint permanent. Defendant Felicissimo moved to modify the order and for a further hearing. His application was denied and defendants appeal.
Plaintiff is a non-profit corporation located in three connected buildings at 706-714 Bergen Avenue in a commercial and retail area of Jersey City. Plaintiff's clinical services include family planning, prenatal care, well-baby care, support and education groups and first trimester pregnancy terminations. An average of 24 to 28 abortions are performed at the clinic on Saturday mornings. On Saturdays, plaintiff also provides prenatal testing to women in the third trimester of pregnancy, including glucose tolerance tests to detect gestational diabetes, and other blood work. These patients enter through the same *205 door as the patients coming for abortions. The clinic is known as "Choices."
According to Marilyn Bennett, the clinic's executive director, about eight to ten anti-abortion activists regularly stood near the door on Saturdays, handing out pamphlets and urging patrons not to have abortions. Defendant Felicissimo was usually among them. At 8:15 a.m. on Saturday, October 19, 1991, only two or three people were handing out pamphlets. However, Bennett had been informed earlier that police barricades were being set up in anticipation of a large demonstration.
Defendants acknowledge that a group of eight to fifteen people had been active at 706-714 Bergen Avenue for over a year or since the Fall of 1990, gathering for prayer, supplication and sidewalk counselling in front of the clinic with the intent of preventing abortions. Before that time, the demonstrators had gathered across Bergen Street in front of a parking lot and did not approach the clinic entrance. "Sidewalk counselling" was described by Felicissimo as approaching a woman entering the clinic to gently inform her of alternatives to abortion and the potential bad effects of abortion in an effort to change her mind. According to Bennett, however, demonstrators would hand the women pamphlets containing dire warnings and bloody pictures of dismembered fetuses and cry: "Don't murder your baby"; "There are murderers in there"; and "They tear the arms and legs off your babies." Clinic manager Juana Melendez said they would also urge staff members, "Stop killing those babies." One staffer, Raven Galloway, was touched physically by a picketer who thrust a pamphlet at her. Bennett and Melendez said that in the past a sole picketer had occasionally entered the clinic and distributed the same pamphlets but had been escorted out by staff. One such person entered on October 18, the day before the large demonstration. This picketer was not identified as under defendants' control. Felicissimo denied knowing her.
*206 The defendant Helpers of God's Precious Infants (Helpers) is an anti-abortion prayer and counselling group coordinated by defendant Felicissimo. The Helpers scheduled a "prayer vigil" at 706-714 Bergen Avenue for October 19, 1991. On October 14 they sought a marching or parade permit and a police escort. Apparently, no official permit was required or issued but a police escort was provided. The Helpers attended Mass at St. Aedan's, a Roman Catholic Church, and were then led by Auxiliary Bishop David Arias of the Newark archdiocese in a ten-block walk to plaintiff's clinic under police escort.
At the clinic, police had set up marked police barricades which bisected the sidewalk along the frontage of the three clinic buildings, which comprises most of the short block between Duncan and Fairmount Avenues, leaving about a five-foot width between the barriers and the buildings, and a five-foot width between the barriers and the curb. The 120 to 140 demonstrators stood behind the barricade, some on the sidewalk and some overflowing five deep into the street, requiring the police to close the northbound lane of Bergen Avenue to all traffic except buses which were guided around the demonstrators. They held a large wooden crucifix and placards saying "Babies Killed at 710 Bergen Avenue" and "Abortion Kills Children."
Led by Bishop Arias and others whose voices were electronically amplified, the demonstrators recited the rosary and sang hymns. Bishop Arias characterized the group as "calm, peaceful and prayerful." Felicissimo described the amplified voices as "not loud" and only sometimes clear. However, Bennett described the speaking as repetitive chanting, so loud that it was audible inside the clinic and in adjacent buildings even with all the doors and windows closed. During the group prayers, sidewalk counselling within the barricade allegedly was suspended but did continue at the ends of the barricade.
Plaintiff sought to limit future demonstrations to a site across Bergen Street from the clinic, generally on the sidewalk *207 in front of a parking lot, asserting that defendants' presence in front of the clinic prevented or deterred some patients from receiving abortions or other medical care. According to Nancy Mascio, a clinic volunteer who arrived on October 19 at about 8:30 a.m., two picketers stood on the sidewalk on the building side of the police barricades and distributed literature and spoke to patients and passersby. Four or five clinic staff and volunteers identified by special shirts and "Escort" labels, escorted patients to the door. Because of the dense group of protestors in front of the clinic, arriving patients had no clear path from the street to the door.
Mascio said that at least one patient became discouraged and left. Some patients called the clinic complaining that they could not gain entry or to request help getting inside. According to Clinic Manager Melendez, only twenty-five of the forty-five women who had scheduled abortions kept their appointments that day. Amparo Rodriguez, a laboratory technician who oversees blood testing for baby care, prenatal care and abortion patients on Saturdays, said that three of her five scheduled patients did not come in that morning. She telephoned one high-risk patient who did not appear and instructed her to go to the hospital for the diabetic testing she urgently needed. One blood-test patient who managed to gain entry appeared upset by the demonstrators' presence.
Bennett said that patients inside the clinic looked anxious. They moved away from a window, which allowed a view of the demonstrators, to a windowless room. Clinic staffer Raven Galloway, who had volunteered to facilitate operations that day, said that patients were distressed by the window view as well as by the sounds of chanting and singing outside. She moved about ten or fifteen patients to a back room with no windows. Although there was less noise, the noise from demonstrators could still be heard over the sound from a television set playing in the windowless room.
*208 Monsignor Reilly, a participant in the October 19 demonstration, described the crowd as "totally peaceful and prayerful." He said that clinic patients had no difficulty at all entering and that near the edge of the group, he could hardly hear the amplified speakers. Another priest, Father Quackenbush, explained that the demonstration was part of a countrywide "pro-life" movement toward public prayer at abortion clinics. As part of that movement, defendants began to demonstrate across the street from plaintiff's clinic in April 1990 and continued on most Saturdays until the Fall of 1990, when they moved directly in front of the clinic and added sidewalk counselling to the prayer support.
Felicissimo testified that plaintiff had filed no formal complaints against the Helpers during the prior year, although police were sometimes present at Saturday demonstrations and did reiterate picketing rules, supposedly in response to plaintiff's complaints. According to Bennett, she had complained to police on numerous occasions when picketers interfered with access to the clinic door.
On October 19, Sergeant Donald Kelton, the officer in charge at the scene, refused Bennett's request to provide documents he had identifying the protestors or authorizing the demonstration. He referred her to the Erie Street office of the chief of police, although ostensibly aware that this office, over a mile from the clinic, was closed.
Plaintiff then immediately sought to judicially restrain further demonstrations of this character. Because plaintiff did not know the identity of the demonstrators, an ex parte hearing was held that morning. Through the testimony of Sergeant Kelton, plaintiff discovered the identities of defendants, Felicissimo and the congregate Helpers. From the testimony of Sergeant Kelton, Jose Gonzalez, another officer on the scene, and Bennett, Judge Schaeffer concluded that the demonstrators were interfering unduly with patients' access. He also found interference with traffic. He entered the temporary order on *209 October 19, restraining trespass at 704-716 Bergen Avenue or any gathering so as to disrupt, intimidate or harass staff or patrons, making obscene or abusive comments or loud accusations, or intentionally interfering with traffic into or out of the clinic. Pickets were limited to the sidewalk across Bergen Avenue, which is about 36-feet-wide at that point.
After a three-day plenary contested hearing on October 25, 28 and 29, 1991, Judge Schaeffer made the temporary restraints permanent. He found that the graphic and explicit literature distributed and placards displayed were overwhelming to patients and that defendants' conduct harassed and intimidated patients who sought to enter the clinic. He found that the intense din of the amplified prayer of the large group created a disturbance within the clinic, and harassed both staff and patients. He also found that defendants had trespassed by entering the clinic to leave literature, and that the interference with street traffic constituted an inherent hazard or public nuisance.
Judge Schaeffer partly relied on a videotape recorded by one of the demonstrators to determine that the group formed a "solid mass" obstructing ingress and egress. He found that sidewalk counsellors operated in front of police barricades before the arrival of the large group of demonstrators and also at the barriers' extremities. He concluded that despite the orderliness of the demonstration and the absence of violence, clients of the clinic were effectively prevented from rightful access to abortions and other health care. The judge made these very specific findings:
The witnesses for the Center testified that the number of demonstrators who gathered in an arch or "half moon" around the entrance to the Center was sufficient to deter its patients from entering the premises. Additionally, it was elicited by witnesses that those patients who did enter the premises for the most part were met by the Center's volunteers in the street or other designated places to assist and comfort them as they walked through or passed the demonstrators. There was additional testimony and pictures ... which indicated that one of the demonstrators was immediately in front of the Center's entrance in an effort to deter patients from entering the premises. This *210 occurred during the morning of October 19, prior to the main body of demonstrators arriving at the Center's door.
Viewing the videotape ..., which was taken on October 19, 1991, indicated that this was not a continuous taping of the entire proceeding in front of the Center, but the taping was done in an "on-and-off" fashion by one of the demonstrators who was within the barricade constructed by the Jersey City Police Department. However, it is obvious from this tape that the demonstrators were a solid mass of people arched in front of the entrance to the Center with no ingress except through the picketers or in the walkway established by the police barricade which divided the sidewalk between the Center and the demonstrators. Moreover, Monsignor Reilly and Mr. Felicissimo testified that there were sidewalk counselors at the extremities of the group and within the police-imposed barriers, which situation caused yet another obstruction to the Center's entrance.
Further testimony revealed that there were sidewalk counselors within the barricade and in front of and/or in close proximity to the Center's entrance door prior to the arrival of the main group; that upon the arrival of the main body of demonstrators, various members remained at times within the barricade and that the sidewalk counselors did stay within the barriers, but at its extremities during the prayer vigil or demonstration.
Recognizing that defendants had demonstrated across the street without incident for more than a year before May or June, 1991, the judge concluded that he could reasonably limit future demonstrations to that area.[1] The November 4, 1991 permanent injunction closely followed the language of the temporary restraining order and imposed the same restraints. The order said:
1. Anthony J. Felicissimo and the Helpers of God's Precious Infants and/or persons and organizations affiliated, acting in concert or combination with Anthony J. Felicissimo and/or the Helpers of God's Precious Infants shall desist and refrain from invading or trespassing upon the property of the plaintiff, Horizon Health Center, located at 706-714 Bergen Avenue, Jersey City, New Jersey, from gathering, parading, patrolling and picketing the property of Horizon Health Center in such a manner as to disrupt, intimidate or harass the staff, employees or patients or persons accompanying patients of Horizon Health Center and specifically from using obscene or abusive language *211 or insults or epithets directed at Horizon Health Center's medical and executive staff or at patients or persons accompanying patients desiring to use their professional services and at their employees, and refrain from making loud accusations and shouting statements which are abusive at the aforesaid staff; physicians and/or patients and persons accompanying patients;
2. That said persons or organizations shall desist and refrain from intentionally interfering with the flow of traffic into and out of Horizon Health Center's premises by blocking and/or obstructing ingress into or egress from same; and
3. That the activity of the demonstrators shall be limited to the sidewalk on the western side of Bergen Avenue opposite Horizon Health Center, 706-714 Bergen Avenue, Jersey City, New Jersey....

I
The defendants make three contentions on this appeal which we set out in their own words:
I. THE PERMANENT INJUNCTION BLATANTLY VIOLATES THE DEFENDANTS' RIGHTS TO FREE SPEECH, FREE ASSEMBLY AND FREE EXERCISE OF RELIGION UNDER THE UNITED STATES CONSTITUTION AND THE NEW JERSEY CONSTITUTION.
II. THE COURT BELOW ABUSED ITS DISCRETION IN GRANTING THE PERMANENT INJUNCTION WHERE NO BASIS EXISTS FOR FINDING AN INJURY FROM WHICH THE PLAINTIFF COULD BE PROTECTED.
III. ENTRY OF INJUNCTIONS PURPORTING TO BE TIME, PLACE, AND MANNER RESTRICTIONS VIOLATES THE CONSTITUTIONAL SEPARATION OF POWERS BETWEEN THE JUDICIAL AND THE LEGISLATIVE DEPARTMENTS.
We address these issues in order.

II
Defendants claim that the time, place and manner restrictions imposed on their prayer vigil violated their federal and State constitutional rights to free speech, free assembly and free exercise of religion. They claim these restrictions were impermissible prior restraints, both improperly content-based and overly broad. Plaintiff responds that the restrictions are constitutional because properly and narrowly tailored to protect significant governmental and personal interests, i.e., preserving access to health care including abortions but still permitting ample alternative channels of communication. We agree with the plaintiff and affirm the judge's order in this regard.
*212 The First Amendment to the United States Constitution, applicable to the states through the Fourteenth Amendment, provides in pertinent part: "Congress shall make no law ... prohibiting the free exercise [of religion]; or abridging the freedom of speech ...; or the right of the people peaceably to assemble...." In a "quintessential" public forum, such as a public street or sidewalk, government may not prohibit all communicative activity. Perry Educ. Ass'n v. Perry Local Educators' Ass'n, 460 U.S. 37, 45, 103 S.Ct. 948, 955, 74 L.Ed.2d 794, 804 (1983). Any content-based restrictions are permitted only where quite necessary to serve a compelling state interest and must be narrowly drawn to achieve that end. Content-neutral regulations of time, place and manner of expression are permitted only if they are narrowly tailored to serve a significant state interest and if they leave open ample alternative channels of communication. Ibid. Peaceful picketing has long been considered communicative activity protected by the First Amendment. Thornhill v. Alabama, 310 U.S. 88, 104, 60 S.Ct. 736, 745, 84 L.Ed. 1093, 1103 (1940); Pebble Brook, Inc. v. Smith, 140 N.J. Super. 273, 276, 356 A.2d 48 (Ch.Div. 1976).
Defendants contend that this injunction is an impermissible prior restraint on speech, citing Organization for a Better Austin v. Keefe, 402 U.S. 415, 91 S.Ct. 1575, 29 L.Ed.2d 1 (1971). We agree that there is a heavy presumption against such restraints. Id. at 419, 91 S.Ct. at 1578, 29 L.Ed.2d at 6. In Keefe, the Supreme Court struck down as an impermissible prior restraint an Illinois injunction prohibiting the defendants' distribution of literature. However, the Keefe Court did not preclude all restraints on public expression. It rejected the injunction of the Illinois court because it would have operated to suppress public expression without any demonstrable threat of a private wrong. Id. at 418-19, 91 S.Ct. at 1577-78, 29 L.Ed.2d at 5. The anti "block busting" or "panic peddling" pamphlets were to be distributed to the public and were not directed at the plaintiff's home, so no threat to privacy was *213 shown. The distribution was entirely peaceful and without disturbance. Here, in contrast, the judge found that clinic patrons were intimidated by the Helpers' protest and many were effectively deprived of rightful access to clinic services, which included health services unrelated to abortion.
Defendants Helpers also contend that their demonstration was not excepted from First Amendment protection because of offense to listeners since the speech was not obscene and not "fighting words." We agree, and plaintiff does not contend otherwise. Government may not prohibit the expression of ideas merely because society is offended by them. Forsyth County v. Nationalist Movement, 505 U.S. ___, ___, 112 S.Ct. 2395, 2403-04, 120 L.Ed.2d 101, 114 (1992) ($1,000 parade fee); United States v. Eichman, 496 U.S. 310, 319, 110 S.Ct. 2404, 2410, 110 L.Ed.2d 287, 296 (1990) (flag desecration). However, just because defendants' demonstration enjoyed First Amendment protection despite its potential offense to listeners, does not mean it was exempt totally from reasonable time, place and manner restrictions.
Defendants also urge that their demonstration should enjoy even greater protection under the State Constitution. The New Jersey Constitution, art. I, ¶ 6, provides in pertinent part: "Every person may freely speak, write and publish his sentiments on all subjects, being responsible for the abuse of that right. No law shall be passed to restrain or abridge the liberty of speech...." This provision, like the First Amendment, protects peaceful picketing. Independent Dairy Workers Union v. Milk Drivers & Dairy Employers Local No. 680, 23 N.J. 85, 97-98, 127 A.2d 869 (1956); "Interestingly, the guarantee here is stated as an affirmative right of the people, not merely a limit on government action as contained in the First Amendment to the Federal Constitution...." Robert F. Williams, The New Jersey State Constitution 34 (1990). In certain contexts, the State constitutional provision has been construed more broadly in scope than the First Amendment. *214 State v. Schmid, 84 N.J. 535, 558-60, 423 A.2d 615 (1980), appeal dismissed, Princeton Univ. v. Schmid, 455 U.S. 100, 102 S.Ct. 867, 70 L.Ed.2d 855 (1982); State v. Brown, 212 N.J. Super. 61, 63, 513 A.2d 974 (App.Div.), certif. denied, 107 N.J. 53, 526 A.2d 140 (1986). That difference, application to private persons as well as to state action where private property is open to public use, is irrelevant here, where it is State action, the injunction, against which defendants seek relief and the forum is a public way. "Generally speaking, however, free speech matters have been analyzed [by the New Jersey Supreme Court] under federal constitutional principles." Williams, supra, at 34.
Defendants also contend that if their picketing and prayer vigil may be subject to time, place and manner restrictions, this injunction was not such a valid restriction because it was content-based, was not narrowly tailored to serve a significant governmental interest, and did not leave available ample alternative channels for communication. Defendants argue, in part, that the injunction was impermissibly content-based, because it was restricted to defendants and their followers, all avowed anti-abortionists, and prohibitive of "obscene or abusive language or insults or epithets directed at [staff or patients]," including such language as "They Kill Babies Inside."
We disagree with defendants' claims that the injunction was necessarily content-based because restricted to them. The Third Circuit recently rejected this contention, cogently explaining that the nature of injunctive relief itself requires threat of harm by, and therefore a limitation of the remedy to, specific defendants. Northeast Women's Center, Inc. v. McMonagle, 939 F.2d 57, 63 (3d Cir.1991). See R. 4:52-4 (providing that injunction must be specific and reasonably detailed and binds only parties, their agents and those acting in concert actually noticed).
If defendants' argument were accepted, expressive activity could never be restrained absent a state interest sufficiently *215 compelling to permit a restraint based on content. History is to the contrary; both federal and state courts have upheld picketing injunctions with valid time, place and manner restrictions based on a significant state interest. McMonagle, supra, 939 F.2d 57; Planned Parenthood of Monmouth County v. Cannizzaro, 204 N.J. Super. 531, 499 A.2d 535 (Ch.Div. 1985), aff'd o.b., 217 N.J. Super. 623, 526 A.2d 741 (App.Div. 1987). Limitation of the remedy to defendants alone must be tested under the requirement that the relief be tailored to its legitimate purpose, not under the requirement that constraints be content-neutral. McMonagle, supra, 939 F.2d at 62-63, 66.
Defendants also contend that the injunction was not narrowly tailored to serve a legitimate governmental interest, because their peaceful demonstration, prayer and sidewalk counselling did not physically disrupt the clinic's functioning. Defendants claim the threat of harm was insufficient to trigger State protection. They basically dispute the judge's finding that the volume of prayers disturbed patients and staff inside and outside the clinic and assert that in any case moving the group across the street does not lower volume but only prevents direct contact with patients (sidewalk counselling). We conclude that the judge's findings in this regard are supported by the record made in open court and are due substantial deference. Rova Farms Resort v. Investors Ins. Co., 65 N.J. 474, 484, 323 A.2d 495 (1974). We see no reason to question or disturb them on this record.
Defendants also dispute the judge's findings that the protestors caused a safety hazard by interfering with street traffic and that they trespassed by entering the clinic. The finding of interference with traffic was supported by the record which showed that the northbound lane of Bergen Avenue became impassable. As to the trespass, there was testimony that at least one picketer had entered the clinic to distribute the same literature dispensed by defendants on the street. Felicissimo denied any knowledge of this trespass and the offender was *216 never identified as part of defendants' group. No criminal offense was ever charged.
We agree with defendants that this alleged trespass alone, not clearly attributable to defendants, could not in itself support the injunction. However, taken with the picketers' demonstrated interference with clinic business, unauthorized entry for distribution of defendants' literature was reasonably considered by the judge in formulating the restraint. Defendants seem to dispute only the use of trespass as evidence of threatened harm, not the inclusion of trespass restraints in the scope of the remedy. They do not claim that the restraint of trespass infringes on their free expression, but rather profess that they did not trespass, and did not intend to trespass. They do not claim that plaintiff's private property should have been available to accommodate their free speech rights. See State v. Schmid, supra, 84 N.J. at 562-63, 423 A.2d 615.
Defendants also dispute the judge's finding that potential clients were effectively prevented from receiving clinic care. This finding was supported by testimony that a significant percentage of women who had scheduled appointments on the day of the demonstration did not keep them and that some patients telephoned and said they could not get through the crowd or requested help in getting through. Defendants contend that the persuasive content of the sidewalk counselling and group prayers, which annoyed listeners but presumably pricked their consciences, not the form of the demonstration or protest, was responsible for turning away clients. One woman, Paulina Bindi, did testify that she was not intimidated but was convinced by a sidewalk counsellor to reverse her prior decision to undergo an abortion. However, there was ample evidence to support the judge's finding that the physical presence and volume of the crowd directly in front of the clinic and around the approaches effectively interfered with ingress.
Defendants also contend that the injunction failed to leave open ample alternative channels of communication. They *217 do not assert that they cannot be heard across the street, or that their placards cannot be seen, or that their presence and their views can not be made plain to clinic staff, patients and visitors. Their complaint is that they will not be able to confront or intercept willing and unwilling listeners alike because staff, patients and visitors will not have to pass close to picketers in order to enter the clinic. However, the First Amendment does not ensure a captive audience but rather the reasonable opportunity for persuasion. Bering v. SHARE, 106 Wash.2d 212, 721 P.2d 918, 930 (1986) (upholding injunction barring anti-abortion picketing in front of public entrance to medical building), cert. dismissed, 479 U.S. 1050, 107 S.Ct. 940, 93 L.Ed.2d 990 (1987).
In our view, the position across the street is a reasonable alternative site, although surely not defendants' first choice. The alternate site permits expression well within ready sight and sound, without the risk of physical intimidation of clinic users or the need to run a gauntlet to get rightful services. The alternate site also considers interference with Bergen Avenue arterial traffic. In Portland Feminists Women's Health Center v. Advocates for Life, Inc., 859 F.2d 681, 685-87 (9th Cir.1988), the court upheld a "free zone" twelve-and-a-half feet around the clinic door and prohibited a noise volume which substantially interfered with the provisions of medical services. In Planned Parenthood Ass'n v. Holy Angels Catholic Church, 765 F. Supp. 617, 626-27 (N.D.Cal. 1991), the court imposed a no-protest zone within 25 feet of the clinic entrance to insure "peaceful" protest. In Pro-Choice Network v. Project Rescue, 799 F. Supp. 1417, 1440-41 (W.D.N.Y. 1992), the court engaged in First Amendment balancing and granted a preliminary injunction that severely restricted sidewalk counselling and banned demonstrations within fifteen feet of doors or parking lot entrances. Also in 1992, the Supreme Court of North Dakota upheld a preliminary injunction that prohibited harassment, intimidation, physical abuse, and obstruction of clinic services, and limited peaceful picketing within one hundred *218 feet of the property to two people. Fargo Women's Health Org., Inc. v. Lambs of Christ, 488 N.W.2d 401, 407 n. 1 (N.D. 1992). The North Dakota court rejected a provision specifically enjoining distribution of literature to those who indicated reluctance to receive it, saying that the prohibition on physical abuse would prevent demonstrators from physically forcing literature on passersby. Id. at 411.
The North Dakota court distinguished the circumstances before it, where protestors entered the clinic, blocked doorways and driveways, swarmed people trying to enter, and used force against patient escorts, from the situation in Mississippi Women's Medical Clinic v. McMillan, 866 F.2d 788, 791 (5th Cir.1989),[2] where there was no evidence of physical restraint of patrons. Fargo, supra, 488 N.W.2d at 408. See generally cases collected at Bray v. Alexandria Women's Health Clinic, ___ U.S. ___, ___ n. 2, 113 S.Ct. 753, 760 n. 2, 122 L.Ed.2d 34 (1992) (Stevens, J. dissenting).
In addition to urging that the injunction violates their free expression, defendants claim that it violates their free exercise of religion. They contend that the prayer vigil was lawful conduct founded in religious beliefs and protected by the Free Exercise Clauses of both the federal and State constitutions.[3] They cite Farhi v. Commissioners of the Borough of Deal, 204 N.J. Super. 575, 583, 499 A.2d 559 (Law Div. 1985), which relied on our State constitutional provision to strike down an ordinance preventing worship services in private residences. Defendants contend that the relegation of picketing and group prayers to the opposite side of the street was not so much *219 based on their disturbing volume and intimidating physical proximity as on their disturbing content.
The proper test is whether the injunction prohibiting further prayer vigils on the sidewalk directly in front of the clinic unreasonably burdened defendants' freedom to practice their religion, and, if so, whether the State's interests outweighed that burden. New Jersey Bd. of Higher Educ. v. Shelton College, 90 N.J. 470, 481-87, 448 A.2d 988 (1982). Defendants have made no showing that their religious beliefs require public prayer on one side of the street rather than the other. They have demonstrated no genuine burden on religious expression. The public forum status of the sidewalk is not pertinent to this analysis. Indeed, defendants do not really claim that their religious expression was unduly burdened but rather that the place or location restrictions were improperly based on the content of their expression, which was religious, rather than its form, which they assert was not noisy or otherwise harassing. This argument actually is not a free exercise argument but a free expression argument, already considered and subsumed in our treatment of time, place and manner restrictions.

III
Defendants' next claim that there was an insufficient factual basis to enjoin demonstration directly in front of the clinic because plaintiff showed no substantial harm. Though somewhat redundant of the previous point, we address it specifically.
Plaintiff has responded that the record supports the conclusion that the protestors intimidated and harassed clinic staff and patients, so that the granting of an injunction was not an abuse of discretion. We agree with plaintiff that the judge could have reasonably found that the protest interfered with plaintiff's clients' rightful access to health care and abortion services and that the restraints were grounded in fact.
*220 We have in the past upheld restraints against picketers "disrupting, intimidating or harassing" anyone frequenting an abortion clinic in order to protect the rights guaranteed by the federal and State constitutions. Planned Parenthood of Monmouth County v. Cannizzaro, supra, 204 N.J. Super. at 543-44, 499 A.2d 535. In Cannizzaro, the clinic asserted the rights of its clients, whose right to seek birth control and other reproductive-related medical services was ensured by the federal and State constitutions. Id. at 535, 539, 499 A.2d 535, citing Griswold v. Connecticut, 381 U.S. 479, 85 S.Ct. 1678, 14 L.Ed.2d 510 (1965), and Right to Choose v. Byrne, 91 N.J. 287, 450 A.2d 925 (1982). Demonstrators were private persons, but the Cannizzaro court there noted that State-based constitutional rights may be protectable against private persons as well as government. 204 N.J. Super. at 536-37, 499 A.2d 535, following State v. Schmid, supra, 84 N.J. at 559, 423 A.2d 615.
Similarly, the Third Circuit recently upheld restraints against demonstrations by more than six picketers at a time within 500 feet of an abortion clinic during periods when surgical procedures were performed. Northeast Women's Ctr., Inc. v. McMonagle, supra, 939 F.2d at 62-65. Prohibitions against singing or chanting within earshot of patients inside, and other actions that "reasonably might have the effect of intimidating the patients, employees, or staff members" were also upheld. Id. at 72-73.
Defendants contend that here, in contrast to the situations in Cannizzaro and McMonagle there was no showing of assault, harassment, trespass or nuisance which justified the triggering of restraints, but only a mistaken offense to sensibilities. They claim that the judge's finding that potential clients were "effectively prevented from exercising their right to abortion or to receive health care" was not supported by the record, and that no substantial harm was shown.
As previously observed, findings by a trial judge are binding on appeal when supported by adequate, substantial and *221 credible evidence. Rova Farms Resort v. Investors Ins. Co., supra, 65 N.J. at 484, 323 A.2d 495. Defendants are correct that the record showed a relatively orderly, nonviolent protest and the judge so found. But he also found that at least one demonstrator had trespassed by entering to deposit literature. Although the trespasser's identity was not established, there was undisputed testimony that the literature deposited was the same literature distributed by defendants. More importantly, the judge found that the demonstrators, by massing directly in front of the clinic, spilling into the street, and gathering in an arch or "half moon" obstructed the entrance and created a safety hazard; that the sidewalk counselling harassed and intimidated patients; and that the loud prayers were audible inside the clinic and interfered with the provision of medical services.
Defendants do not deny that clinic patrons, including non-abortion patients, were discouraged from entering by the physical obstruction, the prayers and the sidewalk counselling approaches, or that their amplified prayers disturbed patients inside. However, they argue that the effectiveness of the protest was due not to its format, but to the persuasiveness of its content, and that content cannot be a basis for limiting First Amendment rights.
We find it difficult to separate entirely the form of speech from its content when used in a demonstration where physical conduct and the form and content of speech were combined to achieve the cumulative inhibiting effect of deterring or preventing immediate access to and use of the clinic's medical services. However, the judge's findings that defendants' method of persuasion interfered with the rights of clinic patients are deserving of due deference because they are supported by the record, which portrays a physical crowd presence overwhelming to the senses of the ordinary person by its size, sound and position. Such a demonstration made physical proximity to protestors unavoidable and exposure to loudly amplified speech *222 and prayer inescapable. Intimidation, not reason, could easily prevail in this atmosphere, regardless of the message.
Speech does not lose its First Amendment protection simply because it may embarrass listeners or inspire or coerce them into action. NAACP v. Claiborne Hardware Co., 458 U.S. 886, 910, 102 S.Ct. 3409, 3424, 73 L.Ed.2d 1215, 1234 (1982). However, that does not mean that all speech is immune from time, place and manner regulation. As noted, the Washington Supreme Court upheld a similar injunction permitting anti-abortion demonstrations no closer than the sidewalk around the corner from a clinic's main entrance, finding no First Amendment violation in such restrictions. Bering v. SHARE, supra, 721 P.2d at 925.
Defendants also contend that the clinic's patrons had no right to protection for abortion access, citing Webster v. Reproductive Health Services, 492 U.S. 490, 109 S.Ct. 3040, 106 L.Ed.2d 410 (1989), as somehow foreshadowing the "demise" of Roe v. Wade. This claim is unpersuasive. The right to terminate a pregnancy in its early stages, established in Roe v. Wade, 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973), was recently reaffirmed by the United States Supreme Court in Planned Parenthood v. Casey, 505 U.S. ___, 112 S.Ct. 2791, 120 L.Ed.2d 674 (1992); see Sojourner T. v. Edwards, 974 F.2d 27 (5th Cir.1992) (Louisiana statute criminalizing abortion held unconstitutional), cert. denied, ___ U.S. ___, 113 S.Ct. 1414, 122 L.Ed.2d 785 (1993).

IV
We also reject defendants' separation of powers contention. Defendants urge that expressive activities may never be enjoined because this violates the legislature's exclusive authority to regulate time, place and manner of expression. Courts may not exercise powers properly vested in another branch of government. N.J. Const. art. III, ¶ 1.[4] However, we disagree *223 with defendants' contention, unsupported by citation, that any restraint on expression must be initiated solely by legislative action. Both state and federal courts often have upheld injunctions on expressive conduct which meet the constitutional strictures of reasonable time, place and manner. See Perry Educ. Ass'n v. Perry Local Educators' Ass'n, supra, 460 U.S. at 45-46, 103 S.Ct. at 954-55, 74 L.Ed.2d at 804-05.

V
Finally, in the resolution of this conflict between the exercise of the competing constitutional values of free expression and access to medical services including abortions, we are concerned that the permanent restraining order entered in the Law Division might be misconstrued by those charged with enforcement, in terms of content, although it is our view that it is essentially content-neutral. Accordingly, we set forth our cautionary admonition respecting that aspect of the order which enjoins "using obscene or abusive language or insults or epithets" directed at plaintiff's staff, patients, companions, or employees and "making loud accusations and shouting statements which are abusive."
"Content-based regulations are presumptively invalid." R.A.V. v. St. Paul, ___ U.S. ___, ___, 112 S.Ct. 2538, 2542, 120 L.Ed.2d 305, 317 (1992). The permanent injunctive order entered in the Chancery Division should not be construed to regulate the content of the demonstrator's message in any respect. As Justice Scalia said in the recent St. Paul hate-crime ordinance and cross-burning case: "[N]on verbal expressive *224 activity can be banned because of the action it entails, but not because of the idea it expresses...." ___ U.S. at ___, 112 S.Ct. at 2544, 120 L.Ed.2d at 319. The "power to proscribe particular speech on the basis of a noncontent element (e.g., noise) does not entail the power to proscribe the same speech on the basis of a content element...." Id. In sum, the intellectual content of the message may not be the target of the injunction, only the hostile method of its delivery.
The injunction entered here may not be construed as a content-based restriction on expression. It must be construed as focusing specifically and exclusively on the location and manner of expression. The injunction "protects the clinic from loudness and physical intimidation, not from content of speech." Portland Feminists Women's Health Ctr. v. Advocates for Life, Inc., supra, 859 F.2d at 684.
With this cautionary admonition as to the scope of the permanent restraint, we affirm.
NOTES
[1] The testimony actually was not that defendants had demonstrated across the street for more than a year before June 1991, but that they had demonstrated across the street from April 1990 until October 1990, that is until a year before October 19, 1991. Bennett testified to this as did Felicissimo and Father Quackenbush. Neither party points out in the briefs this apparent factfinding error.
[2] Judge Gee described this national dispute as a "clash ... between constitutional rights defined by the Supreme Court: an old one tracing its roots to the speech clause of the First Amendment and before, and a new one stemming from Roe v. Wade." Ibid.
[3] The State constitutional provision says: "No person shall be deprived of the inestimable privilege of worshiping Almighty God in a manner agreeable to the dictates of his own conscience." N.J. Const. art. I, ¶ 3.
[4] N.J. Const. art. III, ¶ 1 states:

The powers of the government shall be divided among three distinct branches, the legislative, executive, and judicial. No person or persons belonging to or constituting one branch shall exercise any of the powers properly belonging to either of the others, except as expressly provided in this Constitution.