638 A.2d 1260

HORIZON HEALTH CENTER, PLAINTIFF–RESPONDENT, v. ANTHONY J. FELICISSIMO, HELPERS OF GOD'S PRECIOUS INFANTS, JOHN DOE PICKETERS, AND JANE DOE PICKETERS, DEFENDANTS–APPELLANTS.

Argued October 25, 1993—Decided April 6, 1994.

*Richard J. Traynor* argued the cause for appellants (*Mr. Traynor,* attorney; *Michael Patrick Carroll,* of counsel; *Mr. Traynor* and *Mr. Carroll,* on the brief).

*Cynthia V. Fitzgerald* argued the cause for respondent (*Chasen, Leyner, Tarrant & Lamparello,* attorneys).

*Andrea M. Silkowitz,* Assistant Attorney General, argued the cause for *amicus curiae,* Attorney General of New Jersey (*Fred DeVesa,* Acting Attorney General, attorney; *Jack M. Sabatino,* Assistant Attorney General, of counsel).

The opinion of the Court was delivered by

CLIFFORD, J.

The Chancery Division issued a permanent injunction prohibiting a group of abortion protestors from conducting peaceful picketing on the public sidewalk in front of an abortion and family-planning clinic. The court's order also enjoined defendants from directing any obscene, abusive, or loud language toward the clinic's staff or patients. The Appellate Division upheld the restrictions. 263 *N.J.Super.* 200, 622 *A.*2d 891 (1993). We granted certification, 134 *N.J.* 480, 634 *A.*2d 527 (1993), to determine (1) whether the Chancery Division has the power to regulate expressional activities in a public forum absent violent or criminal conduct, and (2) whether the injunctive restrictions that the trial court imposed are permissible under the federal and State Constitutions. We now affirm so much of the judgment of the Appellate Division as holds that the trial court had the authority to issue an injunction, but we modify that judgment to tailor more narrowly the "manner" restrictions the injunction imposes and remand to the trial court for reconsideration of the "place" restrictions.

I

The Appellate Division's opinion sets forth the facts in considerable detail. We refer to so much of that court's recitation as bears on the issues before us.

Plaintiff, Horizon Health Center (Center), operates a non-profit family-planning clinic in three connected buildings at 706–14 Bergen Avenue, between Fairmount and Duncan Avenues, in Jersey City. The Center offers a variety of medical services including family planning, prenatal care, well-baby care, support and education groups, and first-trimester pregnancy terminations. 263 *N.J.Super.* at 204, 622 *A.*2d 891. Center physicians perform abortions only on Saturdays, conducting an average of twenty-four to twenty-eight procedures each Saturday. Also on Saturdays, in addition to the termination procedures, the Center conducts prenatal testing for women in the third trimester of their pregnancies and performs much of the laboratory work related to its family-planning services. *Ibid.* All patients using the Center's facilities on Saturdays enter the clinic through the same door on Bergen Avenue. *Id.* at 204–05, 622 *A.*2d 891.

In August 1990 members of defendant Helpers of God's Precious Infants (Helpers), an unincorporated group opposed to abortion, began holding prayer vigils on Saturdays on the opposite side of Bergen Avenue from the Center. In October 1990 the Helpers moved their activities to a location directly in front of the Center and began giving "sidewalk counselling" to potential abortion patients. Defendant Felicissimo, coordinator of the group, described sidewalk counselling as "approaching a woman entering the clinic to gently inform her of alternatives to abortion and the potential bad effects of abortion in an effort to change her mind." *Id.* at 205, 622 *A.*2d 891. Defendants' activities also included handing patients pamphlets containing pictures of bloody, dismembered fetuses, warning patients that "[t]here are murderers in there" who "tear the arms and legs off your babies," and urging staff members to "[s]top killing those babies." *Ibid.* During the period from August 1990 to October 1991 eight to fifteen people demonstrated actively outside the Center on Saturdays. In response to the Center's complaints, the Jersey City police occasionally instructed demonstrators not to block access to the Center. During that period, the Center neither requested nor received additional police protection nor did it seek judicial intervention.

On October 14, 1991, the Helpers informed the Jersey City Police Department that the group planned a ten-block march from St. Aedan's Roman Catholic Church to the Center for Saturday, October 19, 1991. The Helpers requested and obtained a commitment for a police escort. On Friday, October 18, 1991, an unidentified demonstrator entered the Center and created a disturbance by repeatedly telling a patient in the waiting room that the Center kills babies. As the Center staff escorted the demonstrator out, the demonstrator said she would be back the next day. *Id.* at 206, 622 *A.*2d 891.

Early in the morning of Saturday, October 19, 1991, Center personnel received information for the first time that the Helpers planned a mass demonstration in front of the Center that day. Initially, Center employees observed only the usual demonstrators outside, but they noticed later that the Jersey City police had erected yellow wooden barriers in the center of the twelve-foot sidewalk in front of the Clinic. More demonstrators began to gather outside the Center, and by nine-thirty that morning, at the height of the clinic's scheduled appointments, 120 to 140 demonstrators had arrived. Some of the demonstrators remained behind the police barricade. Others, however, stood in front of the barricade on the sidewalk. Still other demonstrators stood five deep in the street, forcing police to close the northbound lane of Bergen Avenue to all but bus traffic. *Ibid.*

The demonstrators held a large wooden crucifix and placards stating "Abortion Kills Children" and "Babies Killed at 710 Bergen Avenue." *Id.* at 206, 622 *A.*2d 891. The demonstrators also chanted, sang, and recited the rosary repeatedly in succession. Auxiliary Bishop David Arias of the Newark archdiocese and another priest led the demonstrators in their prayers, using a microphone and a portable speaker to amplify their voices electronically. The Center moved patients sitting in the waiting room to interior, windowless rooms to avoid the noise from outside, but staff and patients inside the Center could still hear the noise and

prayers in the interior areas even after turning up the volume on their radios and television sets. *Id.* at 207, 622 *A.*2d 891.

Because the solid mass of demonstrators left no clear path from the street to the door of the clinic, Center personnel, wearing blue T-shirts and buttons reading "Escort," accompanied a number of patients through the throng so that they could make their way into the clinic. At least one patient left rather than brave the crowd. Other patients called the Center to complain that they could not get into the clinic. Overall, twenty-five of the forty-five women scheduled for abortions and three women scheduled for non-abortion services, including a high-risk patient in need of immediate diabetes testing, did not show up for their appointments on that Saturday. *Ibid.*

The Center's Executive Director, Marilyn Bennett, filed a complaint that Saturday morning on behalf of the Center, seeking to enjoin the activities of the unidentified Helpers and "John Doe" and "Jane Doe" picketers. The Chancery Division conducted an emergent *ex parte* hearing that same day. Based on testimony by Bennett and two law-enforcement officials, the court entered a temporary restraining order, restricting the activities of the Helpers and of all persons acting in concert with them to the sidewalk across the street from the Center. The order also prohibited the demonstrators from disrupting Center operations, from harassing Center personnel or patients, and from intentionally interfering with traffic into or out of the clinic. *Id.* at 208–09, 622 *A.*2d 891.

On October 25, 28, and 29, 1991, the Chancery Division conducted a plenary hearing. The trial court viewed a videotape of the October 19, 1991, demonstration, which the court found supported the testimony of Bennett, Center employees, and patients that the demonstrators had disrupted the normal functioning of the Center. Felicissimo, Bishop Arias, and other demonstrators insisted, however, that the demonstration had not interfered with clinic activities and that the demonstration had been "peaceful" and "prayerful."

On November 4, 1991, the trial court issued a letter opinion making the temporary restraints permanent. The letter opinion noted that the demonstrators had blocked ingress to the clinic and that the "sidewalk counselors" had acted "in such a manner as to harass patients or others from attempting to enter the Center's premises." Consequently, the court concluded that the demonstrators had prevented potential clients of the Center from exercising their right to receive health care generally and from exercising their privacy right to abortion specifically. The court determined, therefore, that it could place reasonable restraints on the demonstrators' activities.

Moreover, the trial court found that the noise of the demonstration had been "of such magnitude as to create a disturbance within the Center, and [had been] a source of harassment to the Center staff as well as the patients." Thus, the court concluded that the public interest in maintaining medical standards and in safeguarding health justified restrictions on the "loudness and magnitude of the prayer vigil * * *."

The trial court's letter opinion also indicated that unidentified demonstrators had trespassed on the Center's private property. Accordingly, the court determined that a restriction prohibiting such conduct was appropriate.

Finally, the trial court noted that the demonstration and the police barricade had interfered with access to the Center and with the normal traffic flow on the public street in front of the Center. The trial court reasoned that the government's interest in controlling traffic and promoting public safety justified a permanent injunction restricting the demonstrators to a location across the street.

Specifically, the permanent injunction that the trial court issued provides:

1. Anthony J. Felicissimo and the Helpers * * * and/or persons and organizations affiliated, acting in concert or combination with Anthony J. Felicissimo and/or the Helpers * * * shall desist and refrain from invading or trespassing upon the property of the plaintiff, Horizon Health Center, located at 706–714 Bergen Avenue, Jersey City, New Jersey, from gathering, parading, patrolling and picket-

ing the property of Horizon Health Center in such a manner as to disrupt, intimidate or harass the staff, employees or patients or persons accompanying patients of Horizon Health Center and specifically from using obscene or abusive language or insults or epithets directed at Horizon Health Center's medical and executive staff or at patients or persons accompanying patients desiring to use their professional services and at their employees, and refrain from making loud accusations and shouting statements which are abusive at the aforesaid staff; physicians and/or patients and persons accompanying patients;

2. That said persons or organizations shall desist and refrain from intentionally interfering with the flow of traffic into and out of Horizon Health Center's premises by blocking and/or obstructing ingress into or egress from same; and

3. That the activity of the demonstrators shall be limited to the sidewalk on the western side of Bergen Avenue opposite Horizon Health Center, 706–714 Bergen Avenue, Jersey City, New Jersey * * *.

[263 *N.J.Super.* at 210–11, 622 *A.*2d 891.]

The trial court rejected defendants' motion to change the form of the judgment from a permanent to a preliminary injunction.

The Appellate Division upheld the permanent injunction against a free-speech challenge under the United States and the New Jersey Constitutions. The court found that the injunction was not content based and that the restrictions focused merely "on the location and manner of expression." 263 *N.J.Super.* at 224, 622 *A.*2d 891. The Appellate Division concluded that the injunction contained reasonable time, place, and manner restrictions because (1) the restrictions are content neutral; (2) they are narrowly tailored to achieve significant governmental interests in protecting the Center's private property, public safety, and the accessibility of health services, including abortion and the maintenance of medical standards; and (3) the restrictions leave open for defendants ample alternative channels of communication. *Id.* at 214–17, 622 *A.*2d 891.

We granted defendants' petition for certification, 134 *N.J.* 480, 634 *A.*2d 527 (1993), in which they argue that the Appellate Division erred because the trial court had no authority to issue an injunction; and that even if the trial court could properly issue an injunction, that injunction violates the First Amendment of the

United States Constitution and article I, paragraph 6 of the New Jersey Constitution.

## II

■   Defendants claim that a court may never enjoin First Amendment expression absent violent or otherwise unlawful activity. They argue that only a legislature may restrict expressive activity in such a context. We disagree with the stated propositions. We hold that the Chancery Division had the authority to impose reasonable injunctive restrictions on the peaceful expressive activities of the Helpers.

■   The authority to issue injunctive relief falls well within the discretion of a court of equity. *Abbott Labs. v. Gardner,* 387 *U.S.* 136, 154, 87 *S.Ct.* 1507, 1518, 18 *L.Ed.*2d 681, 694–95 (1967); *see also Van Name v. Federal Deposit Ins. Corp.,* 130 *N.J.Eq.* 433, 442–43, 23 *A.*2d 261 (Ch.1941) (noting that "granting or refusal [of an injunction] rests in the sound discretion of the court, under the circumstances and the facts of the particular case. It is the strong arm of equity."), *aff'd,* 132 *N.J.Eq.* 302, 28 *A.*2d 210 (E. & A.1942). The Chancery Division can exercise equitable authority, including the granting of injunctions. *See N.J. Const.* art. VI, § 3, para. 4 ("[T]he Law Division and the Chancery Division shall each exercise the powers and functions of the other division * * *, and legal and equitable relief shall be granted in any cause * * *."); *Trustees of Princeton Univ. v. Trust Co. of N.J.,* 22 *N.J.* 587, 598–99, 127 *A.*2d 19 (1956) (noting that Chancery Division did not exceed its discretionary equitable powers in issuing preliminary injunction).

Moreover, courts have noted often that a State may impose content-neutral time, place, and manner restrictions on speech in public forums. *See, e.g., Perry Educ. Ass'n v. Perry Local Educators' Ass'n,* 460 *U.S.* 37, 45, 103 *S.Ct.* 948, 955, 74 *L.Ed.*2d 794, 804 (1983). Although the Supreme Court has stated explicitly that a "State may legislate" to impose such restrictions on speech, *Frisby v. Schultz,* 487 *U.S.* 474, 484, 108 *S.Ct.* 2495, 2502, 101

*L.Ed.*2d 420, 432 (1988), the Supreme Court has never held that a State *must* legislate to impose them. In fact, the Court has allowed judicially-imposed restrictions in the labor-union picketing context, holding that "a State, in enforcing some public policy, * * * whether announced by its legislature or its courts, could constitutionally enjoin peaceful picketing aimed at preventing effectuation of that policy." *International Bhd. of Teamsters v. Vogt, Inc.,* 354 *U.S.* 284, 293, 77 *S.Ct.* 1166, 1171, 1 *L.Ed.*2d 1347, 1353, *reh'g denied,* 354 *U.S.* 945, 77 *S.Ct.* 1423, 1 *L.Ed.*2d 1558 (1957); *accord Independent Dairy Workers Union of Hightstown v. Milk Drivers & Dairy Employees Local No. 680,* 30 *N.J.* 173, 183–84, 152 *A.*2d 331 (1959).

Decisions of other jurisdictions, allowing courts with equitable powers to enjoin peaceful picketing, support the conclusion that the Chancery Division has the authority, in the enforcement of public policy, to issue an injunction against non-violent, non-criminal activity. See, *e.g., Cheffer v. McGregor,* 6 *F.*3d 705, 708 n. 4 (11th Cir.1993) (noting that although injunction prohibiting peaceful expressive activity near abortion clinic might be impermissible because injunction attaches criminal sanctions, trial court "did not overstep [its] authority in crafting the order"); *Northeast Women's Ctr., Inc. v. McMonagle,* 939 *F.*2d 57, 62–63 (3d Cir.1991) (upholding ban on even peaceful picketing outside abortion clinic against protestors who had engaged in acts of violence, intimidation, and trespass); *United States v. Gedraitis,* 690 *F.*2d 351, 356 (3d Cir.1982) (upholding injunction forbidding picketing and protesting at construction site), *cert. denied,* 460 *U.S.* 1071, 103 *S.Ct.* 1527, 75 *L.Ed.*2d 949 (1983).

The Chancery Division entered the injunction against defendants to enforce the following public-policy interests: (1) the accessibility of medical services and the maintenance of medical standards; (2) protection of private property; and (3) public safety. In Part III, B of this opinion, we discuss those public-policy concerns and conclude that all three justify the Chancery Division's grant of equitable relief and constitute significant gov-

ernment interests. Inasmuch as those public-policy interests are valid, we are satisfied that the trial court had the authority to issue injunctive relief against peaceful picketing to promote those interests. We next determine whether the trial court properly exercised that authority, mindful of the requirement that in granting injunctive relief, the trial court had to balance the demonstrators' constitutional right of free expression against those public-policy considerations. *See Crowe v. Di Gioia*, 90 *N.J.* 126, 134, 447 *A.*2d 173 (1982) (outlining requirements for issuance of injunctive relief).

### III

■ The trial court's injunction, prohibiting "gathering, parading, patrolling and picketing," regulates expressive activity traditionally protected by the First Amendment. *See Frisby, supra*, 487 *U.S.* at 479, 108 *S.Ct.* at 2499, 101 *L.Ed.*2d at 428 (noting that "antipicketing ordinance operates at the core of the First Amendment by prohibiting [protesting] on an issue of public concern."). Moreover, any "claim that the [Helpers'] expressions were intended to exercise a coercive impact upon [the patients] does not remove them from the reach of the First Amendment." *Organization for a Better Austin v. Keefe*, 402 *U.S.* 415, 419, 91 *S.Ct.* 1575, 1579, 29 *L.Ed.*2d 1, 5 (1971). Nor does the fact that some of the women might disagree with or feel offended by the Helpers' message remove the expression from its protected status. *See Texas v. Johnson*, 491 *U.S.* 397, 414, 109 *S.Ct.* 2533, 2545, 105 *L.Ed.*2d 342, 360 (1989) (stating that "government may not prohibit the expression of an idea simply because society finds the idea itself offensive or disagreeable"); *Spence v. Washington*, 418 *U.S.* 405, 412, 94 *S.Ct.* 2727, 2731, 41 *L.Ed.*2d 842, 848 (1974) (same). Inasmuch as the injunction regulates protected expression, we must determine the appropriate level of First Amendment scrutiny to apply.

■ Depending on the nature of the forum involved, a State may regulate expressive activity to varying degrees. Quintessen-

tial public forums are those that " 'have immemorially been held in trust for the use of the public and * * * have been used for purposes of assembly, communicating thoughts between citizens, and discussing public questions.' " *Perry, supra,* 460 *U.S.* at 45, 103 *S.Ct.* at 954–55, 74 *L.Ed.*2d at 804 (quoting *Hague v. Committee for Indus. Org.,* 307 *U.S.* 496, 515, 59 *S.Ct.* 954, 964, 83 *L.Ed.* 1423, 1436 (1939)). As the Supreme Court noted in *Frisby, supra,* public streets are "the archetype of a traditional public forum." 487 *U.S.* at 480, 108 *S.Ct.* at 2500, 101 *L.Ed.*2d at 428. Moreover, the Court noted also that "sidewalks have been used for public assembly and debate, the hallmarks of a traditional public forum." *Id.* at 480, 108 *S.Ct.* at 2500, 101 *L.Ed.*2d at 428–29. Because the trial court's injunction limits protected expression on a public street and on a public sidewalk, the injunction regulates speech in a traditional public forum, and we must evaluate the restrictions accordingly.

For a content-based restriction in a traditional public forum to be valid, the restriction must pass muster under the strictest scrutiny: it must be "necessary to serve a compelling state interest and * * * narrowly drawn to achieve that end." *Perry, supra,* 460 *U.S.* at 45, 103 *S.Ct.* at 955, 74 *L.Ed.*2d at 804. Reasonable time, place, and manner restrictions in traditional public forums are valid, however, if they "are content-neutral, are narrowly tailored to serve a significant government interest, and leave open ample alternative channels of communication." *Id.* at 45, 103 *S.Ct.* at 955, 74 *L.Ed.*2d at 804. Therefore, to apply the correct level of scrutiny, we must determine whether the restrictions are content neutral or content based.

## A. *Content Neutrality*

"The principal inquiry in determining content neutrality in speech cases generally and in time, place, or manner cases in particular, is whether the government has adopted a regulation of speech because of disagreement with the message it conveys." *Ward v. Rock Against Racism,* 491 *U.S.* 781, 791, 109 *S.Ct.* 2746,

2754, 105 *L.Ed.*2d 661, 675, *reh'g denied,* 492 *U.S.* 937, 110 *S.Ct.* 23, 106 *L.Ed.*2d 636 (1989). "Government regulation of expressive activity is content neutral so long as it is 'justified without reference to the content of the regulated speech.'" *Id.* at 791, 109 *S.Ct.* at 2754, 105 *L.Ed.*2d at 675 (quoting *Clark v. Community for Creative Non–Violence,* 468 *U.S.* 288, 293, 104 *S.Ct.* 3065, 3069, 82 *L.Ed.*2d 221, 227 (1984)). "The government's purpose is the controlling consideration." *Ward, supra,* 491 *U.S.* at 791, 109 *S.Ct.* at 2754, 105 *L.Ed.*2d at 675.

Defendants contend that the injunction is content based because, as expressed in their brief, "the court restrained * * * only one kind of speech: that issuing from the mouths of pro-lifers." The basis for that argument is that "[b]y definition [the] injunction[ ] appl[ies] to only those named [in the injunction], or others acting 'in concert with' the named parties."

Most of the other courts that have evaluated injunctions similar to the one before us—injunctions that do not refer specifically to content but that restrict only anti-abortion protestors and those acting in concert or in participation with them—have concluded that those injunctions contain content-neutral restrictions. For example, in *Northeast Women's Center, Inc., supra,* the Third Circuit found content neutral an injunction that restricted the expressional activities of the defendant and other anti-abortion protestors. 939 *F.*2d at 63. The court reasoned that the injunction

> regulates when, where and how [defendants] may speak, but not what [they] may say. The * * * injunction make[s] no mention whatsoever of abortion or any other substantive issue—[it] merely restrict[s] the volume, location, timing, and violent or intimidating nature of [the] expressive activity. * * *. It is true that this injunction applies only to [defendants] * * *, but that is because it is only those persons who the Center has proved have created and are continuing to create a threat of violence and intimidation.
>
> [*Ibid.*]

*Accord New York State Nat'l Org. for Women v. Terry,* 886 *F.*2d 1339, 1363 (2d Cir.1989) (finding injunction content neutral because "no discrimination against the defendants or their message

[exists]. The message—that abortion is wrong, immoral, and must be stopped—is not singled out for unfavorable treatment. The injunction is not a ban."), *cert. denied,* 495 *U.S.* 947, 110 *S.Ct.* 2206, 109 *L.Ed.*2d 532 (1990); *Portland Feminist Women's Health Ctr. v. Advocates for Life, Inc.,* 859 *F.*2d 681, 686 (9th Cir.1988) (finding injunction content neutral because "[i]t refers not at all to the specific viewpoints that the advocates press, nor even to the general issues raised at their demonstrations. * * *. It protects the clinic from loudness and physical intimidation, not from content of speech."); *Pro–Choice Network v. Project Rescue,* 799 *F.Supp.* 1417, 1433 (W.D.N.Y.1992) (same), *motion to vacate denied,* 828 *F.Supp.* 1018 (W.D.N.Y.1993); *Planned Parenthood Ass'n v. Holy Angels Catholic Church,* 765 *F.Supp.* 617, 625 (N.D.Cal.1991) (finding injunction content neutral because "[i]t does not, bar defendants' protesting, but controls it so as to balance the rights of both sides"); *Planned Parenthood League v. Operation Rescue,* 406 *Mass.* 701, 550 *N.E.*2d 1361, 1370 (1990) (finding injunction content neutral because it "makes no reference to the specific viewpoints espoused by the defendants or the plaintiffs"); *Fargo Women's Health Org., Inc. v. Lambs of Christ,* 488 *N.W.*2d 401, 408 (N.D.1992) (same); *Planned Parenthood Ass'n v. Project Jericho,* 52 *Ohio St.*3d 56, 556 *N.E.*2d 157, 162 (finding injunction content neutral because "[t]he injunction is not based upon the subject matter or content of speech"), *reh'g denied,* 53 *Oh.St.*3d 706, 558 *N.E.*2d 61 (1990).

We agree with those courts and conclude that the injunction restraining the Helpers and those acting in concert with them is content neutral. In issuing the injunction the trial court did not act with the purpose to suppress anti-abortion messages; the injunction can be justified without reference to the content of defendants' speech. The trial court did not enter the injunction because of what defendants said (the injunction does not refer at all to the content of their speech) but because of how and where they said it. The trial court made specific findings that defendants had interfered with the functioning of the Center, had blocked the access of potential patients to the facility, and had

disrupted traffic on Bergen Avenue. Accordingly, the purpose of the injunction is not to restrain the specific viewpoints of defendants; rather it is to allow defendants to express their views about abortion or any other subject in a manner that does not interfere with or disrupt the Center, its patients, or its staff.

One court evaluating an injunction similar to the one under review determined that the injunction contained content-based restrictions. In *Cheffer, supra,* the Eleventh Circuit reasoned that the injunction was content discriminatory because "[t]he practical effect of * * * the injunction was to assure that while 'pro-life' speakers would be arrested, 'pro-choice' demonstrators would not." 6 *F.*3d at 711. We do not agree with that court's reasoning. Merely because an injunction restricts only a specified group does not make that injunction content based. Courts always tailor injunctive relief to address the specific facts presented to them. *See R.* 4:52–4. The injunction in this case restrains only the Helpers and those acting in concert with them because only those persons actually interfered with the functioning of the Center.

Having determined that the injunction restraining defendants is content neutral, we turn next to the question whether the time, place, and manner restrictions the trial court imposed are reasonable. Specifically, we must decide whether those restrictions (1) serve a significant government interest; (2) are narrowly tailored to serve such an interest; and (3) leave open ample alternative channels of communication for defendants. *Perry, supra,* 460 *U.S.* at 45, 103 *S.Ct.* at 955, 74 *L.Ed.*2d at 804.

B. *Significant Government Interests*

In its letter opinion the trial court asserted that the following public-policy interests, based in the common law, constitute significant government interests justifying the restrictions against defendants: the accessibility of medical services including abortion and the maintenance of medical standards; the protection of private property rights; and public safety. We hold that those

interests justify the trial court's injunctive restrictions even in light of defendants' First Amendment rights. *Cf. In re Farber*, 78 *N.J.* 259, 268, 394 *A.*2d 330 (noting balance between non-constitutional interest of press in protecting confidentiality of sources and criminal defendant's constitutional right to fair trial), *cert. denied*, 439 *U.S.* 997, 99 *S.Ct.* 598, 58 *L.Ed.*2d 670 (1978). The more difficult question is whether those restrictions are narrowly tailored to serve those significant interests.

1. *The Accessibility of Medical Services Including Abortion and the Maintenance of Medical Standards*

The trial court found that the solid mass of demonstrators outside the Center had prevented some of the Center's potential patients from entering the clinic; it found also that the noise of the protest had had adverse consequences on the patients and on the staff inside the clinic. The Center claims that those findings support the Appellate Division's conclusion that the significant State interests in the preservation of health and the accessibility of medical services justify the injunctive restrictions. Defendants, on the other hand, claim that the Appellate Division erred by recognizing a privacy right to abortion, protectable against private interference. We adopt the Center's view of the interests involved and expressly decline to decide the case on the basis of a privacy rationale. Thus, to the extent that the Appellate Division relied on the reasoning of *Planned Parenthood v. Cannizzaro*, 204 *N.J.Super.* 531, 499 *A.*2d 535 (Ch.Div.1985) (enjoining protestors at clinic to protect patients' privacy right to abortion), *aff'd*, 217 *N.J.Super.* 623, 526 *A.*2d 741 (App.Div.1987), we do not adopt its reasoning.

The New Jersey Constitution does not guarantee explicitly a fundamental right to health. Yet, "we recognize that New Jersey accords a high priority to the preservation of health." *Right to Choose v. Byrne*, 91 *N.J.* 287, 304, 450 *A.*2d 925 (1982); *see also Tomlinson v. Armour & Co.*, 75 *N.J.L.* 748, 757, 70 *A.* 314 (E. & A.1908) (noting that preservation of health is "[a]mong the

most [important] of personal rights"). We conclude that because New Jersey has valued it so highly, the preservation of health constitutes at least a significant government interest. Therefore, courts may impose injunctive restrictions to protect health in appropriate circumstances, even if such restrictions might affect some citizens' constitutional rights. *Cf. In re Quinlan,* 70 *N.J.* 10, 36, 355 *A.*2d 647 (noting that in light of State's interest in preservation of life, impingement of religious belief does not present constitutional question), *cert. denied sub nom. Garger v. New Jersey,* 429 *U.S.* 922, 97 *S.Ct.* 319, 50 *L.Ed.*2d 289 (1976); *John F. Kennedy Memorial Hosp. v. Heston,* 58 *N.J.* 576, 279 *A.*2d 670 (1971) (determining that life-saving blood transfusion was appropriate for incoherent patient even though that procedure violated patient's religious beliefs as Jehovah's Witness).

As part of its interest in the preservation of health, the State has at least a significant interest as well in insuring that the Center is able to perform the health services it offers safely, under acceptable medical standards. For example, although the federal constitutional right to abortion, *see Roe v. Wade,* 410 *U.S.* 113, 93 *S.Ct.* 705, 35 *L.Ed.*2d 147 (1973), is not protected against private interference, *see Bray v. Alexandria Women's Health Clinic,* —— *U.S.* ——, ——, 113 *S.Ct.* 753, 758–59, 122 *L.Ed.*2d 34, 46 (1993), "[t]he State has a legitimate interest in seeing to it that abortion, like any other medical procedure, is performed under circumstances that insure maximum safety for the patient." *Roe, supra,* 410 *U.S.* at 150, 93 *S.Ct.* at 725, 35 *L.Ed.*2d at 175; *see also Northeast Women's Ctr., Inc., supra,* 939 *F.*2d at 63 (finding health-safety rationale significant government interest that justified restrictions on picketers outside health center); *cf. Doe v. Bridgeton Hosp. Ass'n Inc.,* 71 *N.J.* 478, 488, 366 *A.*2d 641 (1976) (noting that hospital's efforts to elevate hospital standards and improve medical care will receive broad judicial support), *cert. denied,* 433 *U.S.* 914, 97 *S.Ct.* 2987, 53 *L.Ed.*2d 1100 (1977); *Greisman v. Newcomb Hosp.,* 40 *N.J.* 389, 403, 192 *A.*2d 817 (1963) (same).

Moreover, quite apart from the issue of abortion rights, we conclude that because of its interest in the preservation of health, New Jersey has a significant interest in insuring unrestricted access to the Center's medical services, including family planning, prenatal care, well-baby care, support and education groups, as well as first-trimester abortions. We note that New York City has recently evidenced its interest in protecting access to reproductive health-care services by amending its administrative code to add a chapter entitled "Prevention of Interference with Reproductive Health Services." *New York City, N.Y., Administrative Code* §§ 8.801 to .807 (1994). On March 30 of this year Mayor Giuliani signed that local law, which makes it unlawful

for any person, with the intent to prevent any other person from obtaining or rendering, or assisting in obtaining or rendering; any reproductive health care service or counselling (1) to physically obstruct or block such other person from entering into or exiting from the entryway or exit of a reproductive health care facility, or the premises in which such a facility is located; (2) to follow and harass such other person in or about a public place or places or to engage in a course of conduct or repeatedly commit acts when such behavior places such other person in reasonable fear of physical harm; or (3) to physically damage a reproductive health care facility so as to significantly disrupt its operation, or attempt to do the same.

[*Id.* at § 8.803.]

The trial court therefore had the power to issue injunctive restrictions to preserve health even if those restrictions affected defendants' First Amendment rights. Moreover, because insuring the safety of medical procedures is at least a significant government interest, and because the noise from the protest had a detrimental effect on that interest, the trial court could properly issue injunctive relief to promote that interest as well.

### 2. *Protection of Private Property*

■ The Center asserts that defendants effectively blocked access to the clinic and trespassed on Center property, thereby interfering with the Center's property rights. New Jersey has long recognized that interference with property rights constitutes a basis for equitable relief. *See, e.g., Westinghouse Elec. Corp. v.*

*United Elec., Radio & Machine Workers of Am.,* 139 *N.J.Eq.* 97, 113, 49 *A.*2d 896 (E. & A.1946) (finding that labor picket blocking access to employer's plant "was tantamount to a seizure of [employer]'s property. * * *. Equity alone can provide the adequate remedy.").

We agree with the Appellate Division, 263 *N.J.Super.* at 216, 622 *A.*2d 891, that the trespass by an unidentified demonstrator into the waiting room of the Center was not, standing alone, enough to justify injunctive relief: no evidence connected that trespasser directly to defendants. The Appellate Division determined correctly, however, that defendants did interfere with the Center's property rights by blocking the only entrance to the clinic. *Ibid.* That interference warrants a grant of injunctive relief. Moreover, although the trespass alone does not constitute a basis for relief, we conclude, as did the Appellate Division, that the trial court could reasonably consider the trespass in crafting the injunction because defendants had interfered with the Center's property rights in other ways.

### 3. *Public Safety*

In its letter opinion the trial court pointed out that a number of demonstrators had stood in the northbound lane of Bergen Avenue outside the Center, forcing police to close that lane to all but bus traffic. The Appellate Division affirmed the trial court's injunction on the basis that defendants had interfered with the normal traffic flow on that thoroughfare. 263 *N.J.Super.* at 217, 622 *A.*2d 891. We need not dwell on the proposition that the State does have a significant interest in controlling traffic and protecting public safety. *See, e.g., N.J.S.A.* 39:1–1 to 5F–30 (enumerating various traffic offenses). Thus, the trial court could properly issue injunctive restrictions to prevent interference with traffic and with public safety.

### C. *Narrow Tailoring*

"A [remedy] is narrowly tailored if it targets and eliminates no more than the exact source of the 'evil' it seeks to remedy."

*Frisby, supra,* 487 *U.S.* at 485, 108 *S.Ct.* at 2503, 101 *L.Ed.*2d at 432. "[T]he requirement of narrow tailoring is satisfied 'so long as the * * * regulation promotes a substantial government interest that would be achieved less effectively absent the regulation.' " *Ward, supra,* 491 *U.S.* at 799, 109 *S.Ct.* at 2758, 105 *L.Ed.*2d at 680 (quoting *United States v. Albertini,* 472 *U.S.* 675, 689, 105 *S.Ct.* 2897, 2906, 86 *L.Ed.*2d 536, 548 (1985)). Yet, a regulation may not "burden substantially more speech than is necessary to further the government's legitimate interests." *Id.* at 799, 109 *S.Ct.* at 2758, 105 *L.Ed.*2d at 681.

Injunctions necessarily require an individualized balancing of rights. *See R.* 4:52–4 (requiring that injunction "shall be specific in terms; shall describe in reasonable detail * * * the act or acts sought to be restrained; and is binding only upon [ ] parties * * * and upon such persons in active concert or participation with them * * * "). Because of their nature, injunctions are necessarily more narrowly tailored than regulations of more general application. *See Northeast Women's Ctr., Inc., supra,* 939 *F.*2d at 67 (noting that in examining narrowly-tailored requirement, court is "dealing with a remedial injunction and not an ordinance of general application"). But not every injunction is narrowly tailored merely because it contains specific terms and applies only to certain parties. When an injunction impermissibly exceeds applicable legal standards, appellate courts can modify or rewrite such an injunction to conform to those standards. *See ibid.*

### 1. *The "Manner" Restrictions*

Paragraph one of the trial court's injunction forbids defendants from "gathering, parading, patrolling and picketing * * * to disrupt, intimidate or harass * * * and specifically from using obscene or abusive language or insults or epithets * * *, making loud accusations[,] and shouting statements [that] are abusive * * *." To avoid a content-based application of the injunction, the Appellate Division construed the quoted language to " 'protect[ ]

the clinic [only] from loudness and physical intimidation * * *.' " 263 *N.J.Super.* at 224, 622 *A.*2d 891 (quoting *Portland Feminist Women's Health Ctr., supra,* 859 *F.*2d at 684). Although we agree with the Appellate Division's conclusion that the trial court's "manner" restrictions require modification, we would tailor those restrictions even more narrowly than did the court below.

Other courts have upheld narrower restrictions on anti-abortion protestors than those contained in the trial court's injunction. See, *e.g., Northeast Women's Ctr., Inc., supra,* 939 *F.*2d at 63–65, 72 (upholding restriction prohibiting during surgical procedures, recovery periods, and other specified times "singing, chanting, use of bullhorns, sound amplification equipment, or other sounds or images observable to or within earshot of patients inside the Center"); *Portland Feminist Women's Health Ctr., supra,* 859 *F.*2d at 687 (modifying injunction to prohibit "shouting, screaming, chanting, yelling, or producing noise by any other means, in a volume that substantially interferes with the provision of medical services within the Center, including counseling"); *Project Jericho, supra,* 556 *N.E.*2d at 161–62 (upholding injunction that "prohibits screaming, chanting, speaking or singing in a manner intended to reach or which had the effect of reaching patients inside the clinic").

The "manner" restrictions in the injunction under review should have as their purpose the preservation of health and the safety of medical procedures. In our view the injunction should focus more sharply on the actual problem caused by the noise of the protest: the volume of the noise was so great that it produced a deleterious effect on patients and staff inside the clinic. Therefore, for so much of paragraph one of the injunction as prohibits defendants

from gathering, parading, patrolling and picketing the property of [the] Center in such a manner as to disrupt, intimidate or harass the staff, employees or patients or persons accompanying patients of [the] Center and specifically from using obscene or abusive language or insults or epithets directed at [the Center]'s medical and executive staff or at patients or persons accompanying patients desiring to use their professional services and at their employees, and refrain from

making loud accusations and shouting statements which are abusive at the aforesaid staff; physicians and/or patients and persons accompanying patients;

we substitute the following, prohibiting defendants

from screaming, chanting, singing, speaking, yelling, or producing noise in any other manner, in a volume that interferes with the provision of medical services within the Center;

The foregoing restriction closely tracks the Jersey City noise ordinance, which prohibits "[t]he creation of any excessive noises on any street * * * adjacent to any hospital * * * [that] disturbs or unduly annoys patients in the hospital * * *." *Jersey City, N.J., Municipal Code* § 16–3(a)(7) (1988). Moreover, the amended restriction is aimed more directly at the harm caused and thus more appropriately reflects a balance between defendants' First Amendment rights and the significant government interests at stake.

### 2. *The "Place" Restrictions*

■ Paragraph one of the trial court injunction prohibits defendants "from invading or trespassing upon the property of the [Center] * * *." Paragraph two of the injunction prohibits defendants "from intentionally interfering with the flow of traffic into and out of [the] Center's premises by blocking and/or obstructing ingress into or egress from same." Those restrictions are sufficiently narrowly tailored to serve the significant government interests of preservation of health and the safety of medical procedures, protection of private property, and public safety.

Courts of other jurisdictions that have considered similar restrictions against protestors outside abortion clinics have upheld them. See, *e.g., Northern Va. Women's Medical Ctr. v. Balch,* 617 *F.*2d 1045, 1048 (4th Cir.1980) (upholding injunction preventing various persons "from trespassing on the property of [abortion and family-planning clinic] or interfering with its operations"); *Operation Rescue, supra,* 550 *N.E.*2d at 1364 n. 5, 1371 (finding " 'narrow, carefully tailored, and reasonably specific' " injunction that prohibits "trespassing on, blocking, or in any way obstructing access (either ingress or egress) to [abortion and family-planning

clinic]") (quoting Appeals Court); *O.B.G.Y.N. Ass'ns v. Birthright of Brooklyn & Queens, Inc.,* 64 *A.D.*2d 894, 407 *N.Y.S.*2d 903, 905–06 (App.Div.1978) (modifying injunction to restrict protestors from barring persons from entering or exiting medical clinic); *Project Jericho, supra,* 556 *N.E.*2d at 162 (upholding against First Amendment challenge restriction on "blocking the driveway, entrances or exits from the [family-planning] clinic or the public walkway in front of it").

We agree with the courts referred to above that restrictions prohibiting trespass on and prohibiting blocking or obstructing access to abortion or family-planning clinics are narrowly tailored to meet significant government interests: they do no more than restrain unlawful activity. The more difficult issue is whether the "place" restriction in paragraph three of the injunction, restricting "the activity of the demonstrators * * * to the sidewalk * * * opposite [the Center] * * *," is narrowly tailored.

■ The paragraph-three restriction effectively creates a speech-free or buffer zone around the Center: defendants may not engage in expressive activity in front of the Center because they must remain across the street. We do not perceive the circumstances as requiring such a broad restriction.

Again turning to other jurisdictions, we note that courts have upheld injunctive restrictions creating entirely speech-free zones in certain circumstances. For example, in *Portland Feminist Women's Health Ctr., supra,* 859 *F.*2d at 686, the Ninth Circuit determined that a speech-free zone was necessary to combat the protestors' history of "threats, intimidation, and assault of clinic personnel and clients * * *." *Ibid.* The record in the case before us contains no similar history.

Moreover, even in cases involving violent conduct, most courts have imposed on clinic protestors injunctions less restrictive than those the trial court imposed here. See, *e.g., Northeast Women's Ctr., Inc., supra,* 939 *F.*2d at 65 (upholding general 500-foot buffer zone around clinic, but allowing two people to sit behind table on

sidewalk alongside clinic, distributing literature to and counselling in non-threatening manner anyone who approaches table voluntarily, and allowing six peaceful picketers within 500–foot zone); *New York State Nat'l Org. for Women, supra,* 886 *F.*2d at 1362–64 (prohibiting trespassing on, blocking, and obstructing access to clinic, and prohibiting abusing persons physically, but allowing quiet sidewalk counselling of non-threatening nature); *Pro–Choice Network, supra,* 799 *F.Supp.* at 1433–37 (requiring dual speech-free zones of fifteen feet around entrances, people, and vehicles, but allowing two sidewalk counselors who must stop counselling when targeted person indicates desire to be left alone); *Holy Angels Catholic Church, supra,* 765 *F.Supp.* at 619–20 (exempting peaceful picketers affiliated with church from twenty-five foot bubble zone around clinic).

The facts of our case lend themselves to a more permissive restriction than the one the trial court imposed. The trial court did not find that the sidewalk counselors and protestors had assaulted any patients, nor did the Center, its staff, or its patients report any violence or threats. No one filed a complaint with the police. The primary difficulties that defendants caused related to their large numbers and solid mass directly in front of the Center and to the volume of their expressive activities. Thus, we determine that rather than prohibiting all expressional activities on the sidewalk directly in front of the Center, the injunction should have allowed a limited, controlled form of expression near the entrance while restraining the troublesome mass of protestors to a location across the street.

Because the crafting of an injunctive order imposing "place" restrictions in this case is peculiarly fact sensitive, we remand to the trial court to fashion an injunction that permits some form of expression by defendants near the Center. We recognize the trial court's greater familiarity with the locale and with the contesting participants; and that circumstance, together with the court's demonstrated sensitivity to the competing interests, reassures us

that those interests will be accommodated better at the trial level rather than by this Court.

More specifically, although we have no doubt that a "place" restriction imposing a general buffer zone (requiring the bulk of the demonstrators to remain across the street) is appropriate in this case, we cannot say precisely what limited form of expression in front of the center would be feasible. The injunction should give consideration to the right of the protestors to make their presence known and to the role of sidewalk counselling in that process, while at the same time protecting against any harassment of the patients or others who wish to enter the clinic. In crafting its restrictions the trial court may find guidance in the decisions of other jurisdictions that have imposed on clinic protestors injunctions less restrictive than those that the trial court initially imposed here. See *supra* at 151–53, 638 *A*.2d at 1272–73.

### D. *Alternative Channels for Communication*

After modification, the injunction will provide adequate alternative channels of communication of defendants' message. As the Appellate Division noted, defendants' complaint about the trial court's injunction was that they "will not be able to confront or intercept willing and unwilling listeners alike because staff, patients and visitors will not have to pass close to picketers in order to enter the clinic." 263 *N.J.Super.* at 217, 622 *A*.2d 891. After modification, the injunction will allow defendants reasonable opportunity to do that, inasmuch as the modified restrictions will permit some form of expression near the clinic's entrance. Thus, the injunction will not unreasonably inhibit defendants' ability to communicate with their intended audience: defendants will be able to address staff, patients, and visitors in a civil manner in front of the Center and they may continue to pray, to carry placards, and to express themselves in other ways across the street from the Center.

## IV

Article I, paragraph 6 of the New Jersey Constitution provides in pertinent part: "Every person may freely speak, write and publish his sentiments on all subjects, being responsible for the abuse of that right." We decline to invoke that provision in this case, however. First, we need not turn to the New Jersey Constitution here because the First Amendment adequately protects defendants' right of free expression; as we have indicated, defendants have ample alternative channels of communication for their message. *See Right to Choose, supra,* 91 *N.J.* at 335, 450 *A.*2d 925 (O'Hern, J., dissenting) (favoring yielding to judgment of Supreme Court when federal constitution has shaped and defined right). Moreover, this Court generally analyzes free-speech challenges under federal constitutional principles. *See, e.g., Bell v. Stafford Township,* 110 *N.J.* 384, 393, 541 *A.*2d 692 (1988) (noting that United States Supreme Court constitutional approach to commercial speech "conforms to our own"); *State v. Williams,* 93 *N.J.* 39, 51, 459 *A.*2d 641 (1983) (noting "confluence of the federal and State constitutions in terms of substantive concerns and interpretive philosophy [on issue of First Amendment right of access to criminal proceedings]" and analyzing case under federal principles). Finally, we have declined previously to analyze free-speech challenges under the New Jersey Constitution when federal principles adequately address the issues. See *In re Petition of Felmeister & Isaacs,* 104 *N.J.* 515, 554, 518 *A.*2d 188 (1986) (Handler, J., dissenting) (noting that majority of Court "decline[d] to address the constitutionality of its present [disciplinary] rule under the New Jersey Constitution, despite the fact that the state constitution had been invoked by petitioner"). Thus, we limit our analysis to those First Amendment principles that we have discussed above.

## V

The judgment of the Appellate Division is modified and, as modified, affirmed. The cause is remanded to the Chancery Division for further proceedings consistent with this opinion.

*For Modification and affirmance*—Chief Justice WILENTZ and Justices CLIFFORD, HANDLER, POLLOCK, O'HERN, GARIBALDI and STEIN—7.

*Opposed*—none.